**Willie Troy SINGLETARY, Plaintiff,**

v.

**DISTRICT OF COLUMBIA,
et al., Defendants.**

**No. CIV.A.94–1419 EGS.**

United States District Court,
District of Columbia.

Sept. 30, 2002.

Barbara Jean Kraft, Beins, Bodley, Axelrod & Kraft, P.C., Washington, DC.

Nadine Chandler–Wilburn, Georgia Ann Carty, Carolyn Jean Craig, Office of Corporation Counsel, D.C., Washington, DC.

Kimberly Anne Lincoln Stewart, Manatt, Phelps & Phillips, L.L.P., Washington, DC.

### *MEMORANDUM OPINION*

SULLIVAN, District Judge.

Plaintiff, Willie Troy Singletary, filed this lawsuit against the District of Columbia, the D.C. Department of Human Services, Ruth Royall Hill, Maryann Mesmer, and Katherine Williams, contending that defendants discriminated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (1994), the Rehabilitation Act of 1963, 29 U.S.C. § 794 (1999), American with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* (1995), and 42 U.S.C. § 1983 (1994).

A nine-day non-jury trial was held on May 11–15, June 9, June 15, and June 25–26, 1998. Upon consideration of the entire

record, and based on the evidence introduced at trial, including the testimony of witnesses whose credibility, demeanor and behavior the Court has had the opportunity to observe and evaluate, judgment is entered against plaintiff and in favor of defendants on all claims for the following reasons.

## I. Findings of Fact

1. Willie Troy Singletary ("plaintiff") began his employment with the District of Columbia on October 4, 1971, in the Rehabilitation Services Administration ("RSA"). 5/11/98 Tr. 3. RSA is an agency within the District of Columbia Department of Human Services ("DHS") that provides training and job placement in accordance with the Rehabilitation Act. There are three major programs within RSA that provide services to persons with disabilities: the Rehabilitation Program, the Disability Termination Program, and the Randolph–Shepard Vending Facility Program ("Vending Facility Program"). 6/26/98 Tr. 8.

2. Since 1972, and except for the period from December 1987 to August 1993 while he was assigned to the Vending Facility Program, plaintiff worked as a vocational rehabilitation specialist. His job during that time consisted of placing disabled people in jobs with area government and private employers. 5/11/98 Tr. 2. Plaintiff's starting salary with the District was at a DS–9 level. 5/12/98 Tr. 60. In 1975, plaintiff's salary was increased to a DS–11 level. 5/11/98 Tr. 35.

3. Plaintiff is an albino and is legally blind. 5/11/98 Tr. 6.

4. In March 1986, plaintiff applied for and was rated qualified for the DS–12 position of Supervisor, Visual Impairment Section, for which James Clark, who was Acting Supervisor in that Section, was ultimately selected. Pl.'s Ex. 17, Mem. from City Administrator of 12/29/97; Mesmer Dep. 27–28, 32, 35, 42.

5. Plaintiff filed a complaint of discrimination with DHS' internal equal employment office after he was denied the promotion, alleging discrimination because of his disability and personal appearance. On March 5, 1987 DHS rejected plaintiff's complaint and informed him of his right to file a complaint with the D.C. Office of Human Rights ("OHR"). Pl.'s Ex. 9, Mem. from EEO Officer Clayborne of 3/5/87. In April 1987, plaintiff filed a complaint of discrimination with OHR alleging that he was denied promotion to both supervisory and acting supervisory positions because of his disability and personal appearance. Plaintiff's OHR complaint was not cross-filed with the Equal Employment Opportunity Commission ("EEOC"). Pl.'s Ex. 10, Compl. of 4/1/87. OHR dismissed plaintiff's complaint. On October 28, 1987, plaintiff appealed OHR's dismissal to the Office of the City Administrator (OCA).

6. On November 17, 1987, a few weeks after appealing OHR's dismissal, defendant Katherine Williams reassigned plaintiff and sixteen other employees to the Vending Facility Program. 5/11/98 Tr. 13–15; 5/12/98 Tr. 186; 5/13/98 Tr. 21. The Vending Facility Program was the result of federal legislation that directed each state to establish a program by which individuals who were legally blind could be trained to operate facilities such as cafeterias, snack bars, and gift shops. 5/14/98 Tr. 67.

7. After plaintiff was transferred, his work space was a storage room that was not a regular office. 5/11/98 Tr. 17–19. The storage room was dirty, dusty and without heat, ventilation or adequate lighting. 5/11/98 Tr. 20–21, 49–51, 55–60, 70–71; 5/12/98 Tr. 89, 95–98; 6/9/98 Tr. 114, 117–19. Access to the storage room was through a clinic to which plaintiff did

not have keys. As a result, he could not enter the room at will, and he and colleagues visiting him in the room risked being locked in the room. 5/11/98 Tr. 19, 41, 49; 5/12/98 Tr. 87, 91, 93; 6/9/98 Tr. 120. The phone in the room often did not work, and plaintiff's colleagues often could not get hold of him. 5/11/98 Tr. 100; 5/12/98 Tr. 100–01. No other employee used the storage room as an office space before defendants assigned the room to plaintiff. 5/11/98 Tr. 76. None of the other employees assigned to the Vending Facility Program at that time were placed in workplaces similar to plaintiff's office. All other employees were given regular offices proximate to one another. 5/11/93 Tr. 41, 43. On one occasion, when defendant Williams saw plaintiff sitting in the office of another Vending Facility Program employee, she told him to go back to where he was assigned. 5/11/98 Tr. 100; 5/12/98 Tr. 102.

8. RSA had vacant offices available in the same building, and other office space was available in the Vending Facility Program. 5/11/98 Tr. 19, 41, 43, 76; 6/9/98 Tr. 114–16; 6/26/98 Tr. 44–45. Plaintiff asked his supervisor in the Vending Facility Program and his union representative to attempt to get him assigned to a regular office. In April 1989, plaintiff was assigned out of the storage room to a small clerk's office with poor lighting, adjacent to other Vending Facility Program staff offices. 5/12/98 Tr. 4–6. Eventually, in 1990, he was moved to a regular office space. 5/12/98 Tr. 7; 6/25/98 Tr. 77–78.

9. On December 29, 1987, the OCA remanded plaintiff's discrimination case back to OHR for additional investigation and further findings relating to plaintiff's March 1986 non-selection for the Visually Impaired Unit Supervisor position. With regard to plaintiff's allegation that he was denied an opportunity to perform in an acting supervisor's capacity, the City Administrator found that DHS had discriminated against plaintiff and ordered DHS to "cease and desist from further discriminatory conduct against the Complainant." Pl.'s Ex. 17, Letter from City Administrator of 12/29/87.

10. On January 14, 1988, OHR instructed DHS that it had until January 25, 1988 to respond to the City Administrator's order by articulating, in writing, the reasons for plaintiff's non-promotion. Pl.'s Ex. 18, Letter from Case Enforcement Division of 1/14/88. On February 1, 1988, Verna Clayborne of the DHS Equal Employment Office ("EEO") wrote defendant Williams informing her that defendants were late in responding to OHR's request. Pl.'s Ex. 19, Mem. from EEO Officer Clayborne of 2/1/98. On February 3, 1988, OHR wrote to DHS informing the Acting Director of DHS that OHR had not received DHS's response to its January 14, 1988 request for information. Pl.'s Ex. 20, Letter from Acting Supervisor of OHR of 2/3/88. Defendant Williams was the Administrator of RSA until March 1991 and, as such, had overall responsibility for the management of RSA. 5/13/98 Tr. 16; 5/15/98 Tr. 24.

11. On February 10, 1988, DHS submitted its response to OHR justifying the selection of Mr. Clark over plaintiff. Pl.'s Ex. 22, Mem. from EEO Officer Clayborne of 2/10/88. Additionally, defendant Williams also wrote back to Ms. Clayborne arguing that Mr. Clark had been properly promoted. Pl.'s Ex. 21, Mem. from defendant Williams of 2/8/88.

12. In July 1989, OHR found that, while plaintiff had established a prima facie case of discrimination, DHS had articulated legitimate reasons for not promoting plaintiff, and for its promotion of Mr. Clark. Pl.'s Ex. 37, Letter from Acting Director of OHR of 7/31/89.

13. On August 23, 1989, plaintiff again appealed OHR's dismissal to the City Administrator. Mesmer Dep. 68–69. On May 24, 1990, the City Administrator found that there was probable cause to believe that plaintiff's denial of the supervisory position in 1986 was discriminatory. The City Administrator did not order RSA to appoint plaintiff to a supervisory position, but instead ordered that plaintiff be given priority consideration for the next available position for which plaintiff was qualified. Pl.'s Ex. 48, Letter from City Administrator of 5/24/1990. Priority consideration requires that, apart from being interviewed first in time, the candidate receive additional consideration above and beyond other candidates. 6/9/98 Tr. 31, 66–67. Ms. Clayborne recommended to defendant Williams that plaintiff be appointed non-competitively, consistent with D.C. equal employment opportunity rules, and stated that she was dissatisfied with the length of time RSA had taken to handle plaintiff's complaint. 6/9/98 Tr. 32–33. Defendant Williams took no action whatsoever as a result of the May 24, 1990 OCA Decision, other than to note her disagreement with it. Pl.'s Ex. 58, Letter from defendant Williams of 7/23/1990; 5/13/98 Tr. 57–60.

14. In October 1989, after Mr. Clark's death, Acting Client Services Division ("CSD") Chief Mesmer recruited persons to serve as Acting Supervisor in the Visual Impairment Unit. Pl.'s Ex. 43, Mem. from Mesmer of 1/16/1990; Pl.'s Ex. 44, Mem. from Mesmer of 2/15/90; 5/12/98 Tr. 135; Mesmer Dep. 143–144. Plaintiff applied for the position. Ms. Mesmer was unaware of the City Administrator's December 27, 1987 decision when she later rejected plaintiff's application to serve as acting supervisor. Mesmer Dep. 173. In February 1990, defendant Williams appointed four employees to serve as acting supervisors in the Visual Impairment Unit. Pl.'s

Ex. 46, Mem. from defendant Williams of 2/21/1990.

15. On May 15, 1990, plaintiff filed a second complaint of discrimination with OHR, alleging he had been denied an opportunity to participate in the acting supervisor rotations in retaliation for filing his original complaint with OHR. This complaint was not cross-filed with the EEOC. Pl.'s Ex. 47, Compl. of 5/15/1990; 5/11/98 Tr. 83–84.

16. On June 25, 1990, the Mayor of the District of Columbia imposed a hiring freeze on all positions except those completely funded by grants. Pl.'s Ex. 52, Mayor's Order 90–92 of 6/25/1990.

17. On July 2, 1990, OHR Director Loretta Caldwell wrote DHS, directing compliance with the City Administrator's May 24, 1990 Decision. Pl.'s Ex. 55, Letter from Caldwell of 7/2/1990; 5/14/98 Tr. 6. That same day, Ms. Caldwell wrote plaintiff, directing him to identify supervisory positions for which he was qualified. Pl.'s Ex. 56, Letter from Caldwell of 7/2/1990.

18. On July 11, 1990, Ms. Clayborne wrote defendant Williams, requesting a list of supervisory positions for which plaintiff was qualified, and noting that the hiring freeze did not bar compliance with the City Administrator's Decision. Pl.'s Ex. 57, Mem. from EEO Officer Clayborne of 7/11/1990; 5/13/98 Tr. 47–48; 5/14/98 Tr. 72–75; 6/9/98 Tr. 37–38. Defendant Williams responded on July 24, 1990, and disputed that plaintiff was qualified for any supervisory position. Pl.'s Ex. 58, Letter from defendant Williams of 7/23/1990; 6/9/98 Tr. 69–70.

19. As of July 1990, when Ms. Clayborne made her recommendation to defendant Williams, defendant Williams had already requested a waiver of the freeze order in order to fill three vacant supervi-

sory positions. In November 1990, defendant Williams sought another waiver to fill an additional two vacant supervisory positions without advising Ms. Clayborne of the existence of these two positions, or of her request for a waiver. 5/13/98 Tr. 75; 5/14/98 Tr. 11–12, 17–20.

20. On or about August 21, 1990, plaintiff amended his second discrimination complaint with OHR to allege that defendants failed to comply with the City Administrator's decision. Pl.'s Ex. 64, Am. Compl. of 8/21/1990; 5/11/98 Tr. 87.

21. On September 28, 1990, defendant Williams assigned three of plaintiff's colleagues to acting supervisor positions in the Visual Impairment and the Marketing and Placement Units. Pl.'s Ex. 67, Mem. from defendant Williams of 9/28/1990; 5/13/98 Tr. 100–102.

22. On December 14, 1989, after learning that DHS was recruiting for supervisory positions, plaintiff's counsel wrote OHR Director Caldwell, requesting that Director Caldwell's office obtain personnel documents "necessary to ensure the proper enforcement of the City Administrator's Order." Pl.'s Ex. 73, Letter from plaintiff's counsel of 12/14/1990.

23. On December 20, 1990, defendant Williams informed plaintiff's counsel that RSA had not been able to fill the supervisor positions because of budget constraints, that "we now anticipate that several vacant supervisory positions will be announced in the near future," and that "[a] candidate's qualifications for any position is determined by the District of Columbia Office of Personnel." Pl.'s Ex. 74, Letter from defendant Williams of 12/20/1990; 5/12/98 Tr. 193. At that point, defendant Williams had received a favorable response to her waiver request to fill five supervisory positions. 5/13/98 Tr. 127–128; 5/14/98 Tr. 7.

24. On or about January 14, 1991, RSA posted five supervisory vacancies, including one in the Visual Impairment Unit. Pl.'s Ex. 82, Position Vacancy Announcement of 1/14/1991—1/18/1991. EEO Officer Clayborne advised RSA to place plaintiff in one of the five positions non-competitively. Alternatively, Ms. Clayborne advised that, if plaintiff were to compete for one of the five positions, he was to be given additional consideration above and beyond other applicants and selected for one of the five jobs. 6/9/98 Tr. 16–17, 27, 32–33, 64–65, 68. In February 1991, the Office of Personnel referred to defendant Williams a "Priority Consideration Selection Certificate" listing plaintiff's name. Pl.'s Ex. 96, Personnel Priority Consideration Selection Certificate of 5/8/1991.

25. Shortly after the supervisory vacancies became available, defendant Williams was appointed Commissioner of Social Services, and Ruth Royall Hill was appointed Administrator of RSA. The day before she became Acting Commissioner, defendant Williams briefed defendant Royall Hill about the City Administrator's May 24, 1990 Decision. 5/14/98 Tr. 46–48; 5/15/98 Tr. 86–87; 6/15/98 Tr. 15–16. Ms. Clayborne wrote to defendant Royall Hill and recommended that plaintiff be appointed non-competitively to a supervisory position. 6/9/98 Tr. 71–73; 6/15/98 Tr. 12.

26. Defendants set up a panel to interview candidates for the five vacant supervisory positions. The panel interviewed the candidates and made recommendations to the selecting official, the RSA Administrator. 5/13/98 Tr. 117. The panel interviewed plaintiff for the five positions and determined not to hire him before interviewing any of the other applicants. 5/13/98 Tr. 123; 5/15/98 Tr. 25; 6/9/98 Tr. 101.

27. On June 20, 1991, plaintiff's counsel wrote defendant Royall Hill requesting information about the reasons for plaintiff's non-selection to one of the five supervisory positions. Pl.'s Ex. 103, Letter from plaintiff's counsel of 6/20/1991. Defendant Royall Hill responded on July 1, 1991 that defendants were preparing a "report" explaining the non-selection for the City Administrator, and that counsel would be provided a copy. Pl.'s Ex. 104, Letter from defendant Royall Hill of 7/1/1991.

28. On or about August 20, 1991, OHR closed plaintiff's discrimination case. Pl.'s Ex. 117, Letter from OHR Director of 8/20/1991. Plaintiff appealed the dismissal to the OCA on September 4, 1991. On March 5, 1993, after plaintiff's counsel inquired about the status of his appeal, the OCA responded that OHR's closing of the case was not a final decision on the complaint, and that there were no grounds for appeal. Pl.'s Ex. 129, Letter from OCA of 3/5/1993. Plaintiff sought reconsideration, which OCA denied on April 21, 1993. The denial stated erroneously that plaintiff had a right to appeal to the District of Columbia Court of Appeals. Pl.'s Ex. 131, Letter from OCA of 4/21/1993.

29. In June 1993, plaintiff applied but was not selected for an Acting Supervisor position within the Client Services Division. Mesmer Dep. 20.

30. During his time at the Vending Facility Program, plaintiff had no position description and no official job duties. 5/11/98 Tr. 9–10. A position description identifies the functions that an employee performs while in a specified position. 5/14/98 Tr. 50. Plaintiff, his union representative, and his supervisors continually tried to secure an official position description for plaintiff at the Vending Facility Program. 5/11/98 Tr. 24–25; 5/12/98 Tr. 111, 116, 125–30. However, only the D.C. Office of Personnel can make an official classification of a position. 5/11/98 Tr. 29–31. Until his position was officially classified, it was possible that in the event of on-the-job injury or death, compensation from the D.C. Government might not be available. Plaintiff spoke with his superiors regarding his concerns about the possibility of compensation not being available. 5/11/98 Tr. 29; 5/12/98 Tr. 117, 120.

31. On March 29, 1998, plaintiff received a memorandum from defendant Williams that served as an unofficial interim position description. This interim position description did not reflect what plaintiff was doing in the Vending Facility Program. Pl.'s Ex. 30, Position Description of 3/28/1988; 5/11/98 Tr. 36–37. A year later, in April 1989, defendant Williams gave plaintiff another unofficial interim position description that likewise did not reflect his job duties. 5/11/98 Tr. 39–40. Plaintiff never received an official job description while at the Vending Facilities Program. 5/11/98 Tr. 26, 40; 5/13/98 Tr. 46; 5/14/98 Tr. 70–72; 5/15/98 Tr. 112; 6/15/98 Tr. 48.

32. During his six years in the Vending Facility Program, plaintiff received no annual reviews except for a "non-review" in 1992 and a "satisfactory" in 1993. His 1992 non-review stated that "because there is no job description, there is nothing to evaluate this employee on." Plaintiff refused to sign his 1993 "satisfactory" review because he had no position description or job duties. 6/25/98 Tr. 79; 6/26/98 Tr. 36.

33. In August 1993, Hill transferred plaintiff out of the Vending Facility Program and back to the Marketing and Placement Unit at CSD. 5/11/98 Tr. 82–83, 99, 101–102; 5/12/98 Tr. 163–165.

34. On September 17, 1993, plaintiff filed a charge of discrimination with the EEOC alleging retaliation and disability and physical appearance discrimination.

Pl.'s Ex. 141–A, EEOC Compl. of 9/17/1993.

35. Within a week or two of returning to placement work in August 1993, plaintiff asked for clerical help and computer training due to the increased paperwork the job now required. He also asked for a dictaphone. 5/12/98 Tr. 105; 5/12/98 Tr. 167, 169; 6/24/98 Tr. 93. Plaintiff's supervisor, Melodie Johnson, initially told plaintiff that, apart from the dictaphone, he was asking for too much and that he would have to wait until the National Rehabilitation Hospital ("NRH") evaluated his job and his need for accommodation. 5/11/98 Tr. 105; 5/12/98 Tr. 169–170; 6/24/98 Tr. 93–94; Pl.'s Ex. 146, Mem. from Johnson of 11/1/1993. In November 1993, the NRH came to plaintiff's worksite and evaluated his position. The NRH issued a report and recommended that DHS provide certain accommodations to plaintiff. Pl.'s Ex. 147, Worksite Evaluation of 11/30/1993.

36. Clerical help was assigned to plaintiff beginning in March 1994. 5/11/98 Tr. 108; 5/12/98 Tr. 168. Plaintiff received computer training in early 1994, a computer in September or October 1994, software in November or December 1994, and a printer in December 1994 or January 1995. 5/11/98 Tr. 107. As of November 1994, plaintiff was unable to use the computer because the necessary software had not been installed. 6/26/98 Tr. 34; *see* Pl.'s Ex. 154, Request for Work Accommodations of 6/30/1994; Pl.'s Ex. 156, Letter from computer trainer of 11/9/1994. Plaintiff also asked for a reader/writer to assist him while learning the computer. 5/11/98 Tr. 115. A reader/writer became available in March 1995. 5/12/98 Tr. 168–169, 171.

## II. Conclusions of Law

Plaintiff's case at trial was based on five theories of discrimination: (1) retaliation in violation of Title VII; (2) hostile work environment in violation of Title VII; (3) violation of 42 U.S.C. § 1983; (4) failure to accommodate plaintiff's disability in violation of the ADA and the Rehabilitation Act; and (5) intentional disability discrimination in violation of the ADA and the Rehabilitation Act.

## A. Retaliation

Plaintiff claims defendants engaged in unlawful retaliation against him because he filed complaints of disability and appearance discrimination in 1987 and 1990. Defendants contend that plaintiff has failed to state a prima facie case, failed to rebut their assertions of legitimate, nondiscriminatory reasons and that plaintiff's claims are barred by the statute of limitations. Generally, it is appropriate for this Court to resolve the procedural issues before discussing the merits of the case. However, here it is first necessary to analyze the merits in order to find whether any of defendants' acts were discriminatory. If the Court finds the acts to have been discriminatory, only then can it determine whether discrimination occurred within the statutory period and properly resolve the statute of limitations issue.

While this Court finds that plaintiff has stated a prima facie case of discrimination and is not persuaded by defendants' proffered nondiscriminatory reasons, the Court concludes that the statute of limitations is a bar to plaintiff's recovery of any damages.

### 1. Discriminatory Acts

■ Title VII prohibits retaliation against employees for their opposition to discrimination or because they have filed a charge opposing discriminatory practices. *See* 42 U.S.C. § 2000e–3(a). The allocation of burdens of proof in a Title VII retaliation case follows the general rules enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802–805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see Passer v. Am. Chem. Soc'y*, 935 F.2d 322, 330 (D.C.Cir. 1991). To establish a prima facie case of retaliation, a plaintiff must show that: (1) the plaintiff has engaged in a protected activity; (2) the employer was aware of the activity; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. The Supreme Court has stated that the plaintiff's burden of establishing the prima facie case is "not onerous." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Plaintiff meets the first prong of the *McDonnell Douglas* test. He engaged in protected activity, as defined by 42 U.S.C. § 2000e–3(a), when he filed complaints of disability discrimination and retaliation in 1987 and 1990 with the D.C. Office of Human Rights ("OHR"), and when he pursued those claims before the OHR and the Office of the City Administrator ("OCA").

■ Plaintiff has also met the second prong of the *McDonnell Douglas* burden-shifting test. Defendants were aware of plaintiff's protected activity, as indicated by: (1) the 1987 investigation and dismissal of plaintiff's disability discrimination complaint filed with the OHR; (2) the December 1987 directive by the City Administrator finding defendants' failure to assign plaintiff to an acting supervisor position to have been discriminatory and directing all further discrimination to cease and desist; (3) the May 1990 finding by the City Administrator that there was probable cause to believe that plaintiff's denial of the supervisory position in 1986 was discriminatory; (4) the May 1990 order by the City Administrator to cease all continuing discriminatory treatment; (5) continuing notices from the Equal Employment Office ("EEO"), the OHR, and the Office of Personnel that plaintiff was to be afforded priority consideration in promotions; and (6) written responses by defendant Williams to these notices.

■ Plaintiff has established the third element of the prima facie case by enunciating a list of adverse employment actions. To satisfy this requirement, a plaintiff's complaint must allege actions with "materially adverse consequences affecting the terms, conditions, or privileges of employment." *Brown v. Brody*, 199 F.3d 446, 457 (D.C.Cir.1999). An "employment decision does not rise to the level of an actionable adverse action … unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Walker v. WMATA*, 102 F.Supp.2d 24, 29 (D.D.C.2000). The Supreme Court has defined tangible employment actions as those that result in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

■ First, plaintiff claims that he was reassigned to the Randolph–Sheppard Vending Facility Program and forced to work out of a storage room. Second, plaintiff maintains that he was not given an official position description, which precluded advancement opportunities and, in the event of an on-the-job injury, would have prevented plaintiff from receiving compensation from the D.C. government. Additionally, plaintiff contends that he suffered an adverse employment action by not being promoted to either Supervisor or

Acting Supervisor, despite his experience, skills, and tenure, and notwithstanding a series of requests by the OCA, the OHR and the EEO that plaintiff be afforded priority consideration for the next available position. Finally, plaintiff contends that his transfer in 1993, out of the Vending Facility Program back to the Placement Unit, was a further adverse employment action under Title VII. All of these claims are "tangible" and allege a significant change in plaintiff's employment status. Accordingly, plaintiff has satisfied his burden under the third prong of the *McDonnell Douglas* burden-shifting test.

█ The fourth element of the prima facie case requires plaintiff to demonstrate a causal connection between the protected activity and the adverse employment action. Causation may be established by showing that "the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985). Plaintiff has introduced evidence that within weeks of his first appeal to the OCA in October 1987, he was assigned to the storage room without an official job description. Also, plaintiff has demonstrated that within months of his second complaint to the OHR, defendants failed to provide plaintiff with priority consideration when interviewing him, and ultimately rejecting him, for five supervisory positions in January 1991. This close proximity in time, both between the first complaint and plaintiff's reassignment and between the second complaint and defendants' failure to provide priority consideration to plaintiff, allows this Court to presume that a retaliatory motive was involved in those specific acts.

█ Plaintiff contends that, in 1993, defendants further violated Title VII by failing to promote him to a supervisory position and transferring him back to the Placement Unit. However, a significant period of time elapsed between these alleged adverse employment actions and the original protected activity in 1987 and 1990. Therefore, this Court finds that plaintiff has failed to show a causal connection with respect to defendants' 1993 conduct. *See West v. Fred Wright Constr. Co.*, 756 F.2d 31, 32 (6th Cir.1985) (upholding district court decision that seven months between filing the administrative charge and appellant's discharge was too long a period from which to infer retaliation).

Additionally, plaintiff neither produces direct evidence of retaliatory motive, nor does he offer any circumstantial evidence to support his claims that defendants retaliated against him in 1993. Were he to provide circumstantial evidence demonstrating that other similarly situated employees who·had filed internal grievances of employment discrimination suffered the same fate, the Court might conclude that the causation element for the 1993 adverse employment actions had been satisfied. *See Davis v. Califano*, 613 F.2d 957, 962 (D.C.Cir.1979). However, due to lack of direct evidence, circumstantial evidence, or a close temporal relationship, this Court concludes that plaintiff has failed to establish a prima facie case of retaliation under Title VII with respect to the 1993 non-selection for a supervisory position and the 1993 reassignment back to the Placement Unit.

In summary, plaintiff has established the elements of a prima facie case of retaliation in regards to the following actions of the defendants: (1) the 1987 reassignment to the Vending Facility Program; (2) the 1987 failure to give plaintiff an official job description; and (3) the 1991 failure to grant plaintiff priority consideration and subsequent non-selection for a supervisory position.

■ Once a plaintiff has established a prima facie case of retaliation, a presumption is created that the employer unlawfully discriminated against the employee. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. The burden then shifts to the employer to articulate, with clarity and reasonable specificity, a legitimate, non-discriminatory reason for the retaliatory employment actions suffered by the plaintiff. *Id.; St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The employer must introduce evidence that would support a finding that the unlawful discrimination was not the cause of the employment action. *Burdine*, 450 U.S. at 254–255, 101 S.Ct. 1089. If the defendant satisfies its burden of production, the presumption of discrimination raised by the prima facie case is rebutted. *Id.* at 255, 101 S.Ct. 1089.

■ Defendants carried their intermediate production burden by articulating legitimate, nondiscriminatory reasons for each of the adverse employment actions involving plaintiff. First, defendants claim that the storage room was the only office available for plaintiff at the time of the reassignment and was of substantially the same size and contained substantially the same furniture as other offices. Next, defendants contend that plaintiff could have performed some functions under the auspices of either his previous job description or the interim positions to which plaintiff was detailed, and therefore their failure to provide an official job description was not discriminatory. Finally, defendants contend that they fulfilled their obligation to give plaintiff priority consideration for a supervisory position by interviewing him before all other candidates and making a decision on his application prior to interviewing the other applicants.

■ Defendants having proffered legitimate non-discriminatory reasons for their conduct, the burden shifts back to the plaintiff to persuade the Court that "discriminatory reasons more likely motivated" the conduct or that defendants' "proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. Disbelief of the reasons put forward by defendants, together with the prima facie case, may suffice to show intentional discrimination. *Hicks*, 509 U.S. at 511, 113 S.Ct. 2742; *but see Aka v. Washington Hospital Ctr.*, 156 F.3d 1284, 1290–94 (D.C.Cir.1998) (en banc) (merely rendering evidence that undercuts an employer's explanation may be insufficient to infer discrimination).

■ The Court finds that plaintiff has proven, by at least a preponderance of the evidence, that the proffered non-discriminatory reasons were pretext for retaliatory discrimination. Defendants' explanations for reassigning plaintiff to a storage room do not withstand close scrutiny. Defendants contend that the storage room in which plaintiff was placed upon reassignment to the Vending Program was substantially similar in size and furniture and was the only one available. However, while sixteen other employees were reassigned as part of a reorganization plan, plaintiff was the only employee to be placed in a physically separate part of the office. Furthermore, plaintiff's office was clearly not of the same quality as other offices. The room to which plaintiff was assigned was not previously used as an office space, but rather was used as a general storage room. The storage room was without heat or ventilation. It was poorly lit, which posed problems for plaintiff, who is visually challenged. The only entrance to plaintiff's office was through a clinic to which plaintiff did not have keys. The phone in the room often did not work. The office space contained appropriate office furniture for him, but also contained

brooms, boxes of debris, and a "gigantic bunny rabbit."

Defendants clearly intended to relegate plaintiff to this sub-standard office. On one occasion, when defendant Williams saw plaintiff working in the office of another Vending Facility Program employee, she told him to go back to the storage room where he was assigned. During the first few months in the Vending Facility Program, plaintiff asked his supervisor and his union representative to have him assigned to a regular office space. Ms. Williams testified that she attempted to comply with this request and move plaintiff into more appropriate office space, but there is no evidence to corroborate this assertion. Also, the record shows that there were other, more suitable, spaces in which plaintiff's office could have been located. Therefore, in regards to this specific adverse action, the Court concludes that the defendants' proffered reasons are "unworthy of credence," and pretext for defendants' discriminatory motive. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.

■ The Court further finds· that defendants' proffered reasons for failing to assign plaintiff a position description are pretextual. A position description identifies the functions that an employee may perform while in a specified position. An employee will not receive compensation from the District of Columbia should he or she be injured while performing any function outside of the employee's job description. Further, he or she will not be able to receive performance evaluations, thereby precluding any advancement opportunities. Plaintiff attempted, with the help of his supervisor and his union representative, to secure an official classified position description. During his six years at the Vending Facility Program, plaintiff received no annual performance reviews except for a "non-review" in 1992 and a

"satisfactory" in 1993, which he refused to sign due to his lack of a position description. The non-review stated that, because plaintiff had no official position description, there was nothing on which to evaluate him. Because defendants refused to evaluate plaintiff's job performance in the absence of a job description, any attempt by defendants to convince this Court that plaintiff was covered by his previous job description is unpersuasive. Rather, defendants' inconsistent explanations and behavior persuade this Court that the reasons for this adverse employment action are more likely than not based on the consideration of impermissible factors.

■ Finally, defendants' non-discriminatory explanation for failing to provide plaintiff with "priority consideration" also fails to withstand scrutiny. Defendants' chief EEO officer, Verna Clayborne, instructed defendants that priority consideration required them to give plaintiff additional consideration beyond that given to other candidates. Defendant Williams' testimony claims on one hand that plaintiff was interviewed first and a decision was made to reject him before others were considered, and, on the other hand, that plaintiff would have been selected had he "been deemed most qualified." 5/15/98 Tr. 89. A determination of whether plaintiff was the most qualified of all applicants could not have been made if he had already been rejected prior to the time the other applicants were considered. Thus, the Court concludes that defendants' explanation is implausible, and finds that defendants' failure to give plaintiff priority consideration was retaliatory.

In conclusion, this Court finds that plaintiff has met his burden of proving by a preponderance of the evidence that the following adverse employment actions constituted unlawful retaliation: (1) the 1987 reassignment to the Vending Facility pro-

gram; (2) the 1987 failure to provide plaintiff with an official job description; and (3) the 1991 failure to grant plaintiff priority consideration for a supervisory position.

### 2. Procedural Defenses

The evidence introduced at trial demonstrates that defendants improperly retaliated against plaintiff after he filed internal grievances. However, not all proven cases of discrimination are actionable, nor will all cases of discrimination result in monetary compensation for the plaintiff. Congress, in enacting Title VII, created specific guidelines and procedures for plaintiffs to follow in order to be compensated. *See* 42 U.S.C. § 2000e–5(c), (e). The Supreme Court has held that "strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Mohasco Corp. v. Silver*, 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980).

There are two statutory prerequisites to bringing an action under Title VII:(1) timely filing of charges with the EEOC; and (2) receipt of a notice of right to sue from the EEOC and acting upon it in a timely manner. *McDonnell Douglas*, 411 U.S. at 798, 93 S.Ct. 1817. In the District of Columbia, a deferral jurisdiction, a charge must be filed with the EEOC within the earlier of: (1) 300 days after the discriminatory action occurred; or (2) 30 days after receipt by the individual of notice of termination of the proceedings by the OHR. 42 U.S.C. § 2000e–5(e)(1).

Although plaintiff filed complaints with the OHR in 1987 and 1990 under the D.C.

Human Rights Act, D.C.Code Ann. § 1–2501 *et seq.* (1981) (current version at D.C.Code Ann. § 2–1401 *et seq.* (Supp. 2002)), these administrative complaints were not cross-filed with the EEOC. In fact, these administrative complaints contained instructions not to cross-file with the EEOC, *See* Pl.'s Ex. 10, OHR Compl. of 4/1/1987; Pl.'s Ex. OHR Compl. of 5/15/1990. Plaintiff did not file a charge of discrimination with the EEOC until September 17, 1993. *See* Pl.'s Ex. 141–A, EEOC Compl. of 9/17/1993. Unless some exception applies, all events about which plaintiff complains that occurred more than 300 days prior to September 17, 1993 will be barred.[1]

 Equitable relief from the 300–day EEOC filing requirements is sometimes available under the doctrine of equitable tolling. When the employee is excusably ignorant of the employer's discriminatory act or the existence of a claim, this doctrine may be invoked to toll the statutory period. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). The D.C. Circuit has held that the equitable power to toll the statute of limitations should be exercised "only in extraordinary and carefully circumscribed instances." *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C.Cir.1988). The burden is on the plaintiff to assert and prove equitable reasons for his failure to comply with statutory deadlines. *Saltz v. Lehman*, 672 F.2d 207, 209 (D.C.Cir. 1982). Here, plaintiff has not presented any reason for his failure to timely file

---

1. The Court notes that the OHR terminated proceedings on plaintiff's complaint on August 20, 1991. Plaintiff timely appealed to the OCA and was told on April 21, 1993 that the OCA had no basis for reviewing the case. While plaintiff's failure to file a complaint with the EEOC within thirty days of this no-

tice may have barred this complaint, the defendants have not asserted this defense and it is therefore waived. Accordingly, this Court will focus only on the 300–day statute of limitations in determining the timeliness of plaintiff's EEOC complaint.

with the EEOC, and therefore the doctrine of equitable tolling is not applicable.

Another possible exception to the statutory limitation on filing a claim with the EEOC is the theory of continuing violation. When continuing discrimination is alleged, the complaint may be timely notwithstanding that the conduct alleged is comprised in part of acts lying outside the charge-filing period. *Shehadeh v. C. & P. Tel. Co. of Md.,* 595 F.2d 711, 721, 724 (D.C.Cir.1978). Under the continuing violation theory, if the alleged acts constitute one similar pattern or practice and at least one illegal act took place within the filing period, then the complaint of discrimination is not time-barred and acts outside the statutory period may be considered for purposes of liability. *Id.* at 725.

However, plaintiff is required to allege an actual unlawful discriminatory act, not merely the *effect* of an alleged past discriminatory act. For example, in *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), the Supreme Court held that, for a professor's claim of unlawful termination, the limitations period was triggered at the moment the university allegedly denied the professor tenure for discriminatory reasons. *Id.* at 258, 101 S.Ct. 498. A year later, the plaintiff lost his job as a result of not having tenure. *Id.* at 253, 101 S.Ct. 498. The Supreme Court concluded that his dismissal was an effect of the prior act and not a new discriminatory act. Therefore, the dismissal did not make timely a late-filed EEOC complaint. *Id.* at 258, 101 S.Ct. 498; *see also United Air Lines v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (holding that any continuing impact on pay and fringe benefits

is insufficient to establish continuing violation theory); *Palmer v. Kelly,* 17 F.3d 1490, 1496 (D.C.Cir.1994) ("The first question in analysis of a continuing violations claim is whether an actual violation occurred during the statutory period.").

As discussed above, this Court has found that defendants' conduct involving (1) the 1987 reassignment to the Vending Facility program, (2) the 1987 failure to provide an official job description, and (3) the 1991 failure to grant plaintiff priority consideration constitute unlawful retaliation. However, none of these actions occurred within 300 days of the date on which plaintiff filed his EEOC complaint. Plaintiff argues that the continuing violation theory is applicable here because, during the statutory period, he was without a job description and was denied performance evaluations, thereby preventing any promotional opportunities. He alleges that these examples of misconduct were within the filing period, and permit this Court to consider the actions outside the statutory period for purposes of liability.

While this Court is sympathetic to the plaintiff's circumstances, it concludes that plaintiff has failed to prove that these specific actions were themselves retaliatory. Rather, the Court finds that these actions arose as consequences of previous time-barred discriminatory actions. In the absence of any *acts* of misconduct within the statutory period to serve as an anchor for those acts outside the period, this Court is precluded from applying the continuing violation theory. Accordingly, this Court concludes that the continuing violation theory is unavailable to plaintiff and his retaliation claims are time-barred.[2]

---

**2.** Even were this Court to find that plaintiff has proven specific acts of unlawful retaliation during the statutory period, a recent Supreme Court case would likely bar the application of the continuing violation theory. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. ——, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (holding that the continuing violation theory,

## B. Hostile Work Environment

Plaintiff claims that defendants intentionally created a hostile work environment in violation of Title VII. In response to this claim, defendants raise the same arguments as those presented in opposition to plaintiff's retaliation claim. Namely, they contend that plaintiff has not met his burden of stating a prima facie case, that he has failed to rebut defendant's assertions of non-discriminatory reasons for the adverse employment actions, and that this claim is time-barred by the statute of limitations.

The Court finds that plaintiff's EEOC complaint was filed outside the statutory period, and is accordingly time-barred. As discussed above, plaintiff failed to prove that any retaliatory act occurred within 300 days of September 17, 1993, the date he filed his EEOC complaint. Additionally, as stated above, application of the continuing violation theory is not appropriate in this case. Therefore, the Court holds that plaintiff's hostile work environment claim is barred by the statute of limitations.

 Even were this Court to find that application of the continuing violation theory was appropriate, it is unlikely that the retaliatory harassment experienced by plaintiff would be sufficiently severe or pervasive to constitute a hostile work environment. Title VII prohibits an employer from creating or condoning a discriminatory hostile or abusive work environment. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In order to establish a hostile work environment claim based on retaliation, an employee must show that: (1) the employee is a member of a protected class; (2) the employee was subject to

unwelcomed retaliatory harassment; (3) the harassment was based on the employee's protected activity; (4) the harassment created a hostile work environment; and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior. *See Von Gunten v. Maryland,* 243 F.3d 858 (4th Cir.2001); *Morris v. Oldham County Fiscal Ct.,* 201 F.3d 784 (6th Cir.2000). For the fourth element to be satisfied, the harassment "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Even absent the procedural defects mentioned above, this Court has serious doubts that the defendants' conduct was sufficient to create "an abusive working environment." *Id.* However, any doubts this Court holds concerning the severity of the harassment experienced by plaintiff are moot. Plaintiff failed to timely file a complaint with the EEOC and, accordingly, is not entitled to any remedy.

## C. 42 U.S.C. § 1983

Plaintiff also brings suit against defendants pursuant to 42 U.S.C. § 1983. Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding to redress.

while applicable to charges alleging a hostile work environment, is not appropriate for

plaintiffs raising claims of discrete discriminatory or retaliatory acts).

42 U.S.C. § 1983. Section 1983, by its terms, does not create substantive constitutional rights. Rather, it remedies deprivations of rights established by the Constitution or federal law. *See Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

 State law governs the applicable statute of limitations for plaintiff's section 1983 claim. *See Banks v. Chesapeake & Potomac Tele. Co.,* 802 F.2d 1416 (D.C.Cir.1986). In the District of Columbia, the applicable statute of limitations is three years. *See* D.C.Code Ann. § 12–301(8). Any violations that fall outside the statutory period are time-barred. Plaintiff filed this lawsuit on March 3, 1994 and, consequently, any incidents that occurred before March 3, 1991 are beyond the purview of this Court. However, unlike a Title VII claim, exhaustion of administrative remedies is not a prerequisite to an action under Section 1983. *Patsy v. Bd. of Regents,* 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). Therefore, plaintiff is not barred from filing a Section 1983 claim by the fact that he did not attempt to exhaust his administrative remedies prior to filing this lawsuit.

 Although a local government cannot be liable under a theory of *respondeat superior* for discriminatory conduct of a government employee, a plaintiff may be entitled to monetary damages under Section 1983 if he or she establishes that intentional discrimination was the official policy of the local government. *See Monell v. Dep't. of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality will only be held liable where the "action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S.Ct. 2018. The Supreme Court clarified

this position in *Pembaur v. City of Cincinnati,* holding that "municipal liability attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). In order to impose liability, the challenged action must be taken by a municipal official who has "final policymaking authority," as determined by state law. *Id.* at 483, 106 S.Ct. 1292; *see also Carter v. D.C.,* 795 F.2d 116, 122 (D.C.Cir.1986) (holding that plaintiffs failed to establish a persistent, pervasive pattern of police misconduct attributable to a course deliberately pursued by official policymakers).

Plaintiff argues in an entirely conclusory manner that defendants' actions are a "violation of clearly established law" that should prompt this Court to impose liability under Section 1983. Plaintiff further contends that the defendants' conduct over the years relevant to this case was tantamount to an official policy of the District of Columbia. To support this assertion, plaintiff relies on the fact that defendant Williams acted as the Commissioner of Social Services, and signed plaintiff's personnel documents during the April–May 1991 selection process.

 Commissioner Williams signed many personnel documents during the course of her job, and her signature is simply not sufficient to prove that she deliberately chose to follow an unconstitutional course of action. Plaintiff has submitted no other evidence that would prove that the District of Columbia has established a policy of retaliating against employees for filing internal employment discrimination complaints. While this Court is of the opinion that plaintiff indeed suffered acts of discriminatory retaliation,

nothing in the record before this Court indicates that these acts were the result of a District of Columbia custom, policy or practice.

## D. Failure to Accommodate

Plaintiff also claims that defendants failed to accommodate his disability in violation of both the Rehabilitation Act and the ADA. Defendants allege that plaintiff failed to exhaust administrative remedies prior to filing this lawsuit. This Court holds that plaintiff's failure to accommodate claim is based on actions beyond the scope of his EEOC complaint and therefore must be denied for failure to properly satisfy exhaustion requirements.

When plaintiff was reassigned to the Placement Unit in the Client Services Division in September 1993, he found that the process of conducting placements had changed. These changes, among other things, required plaintiff to complete significantly more paperwork than was required during his original assignment at the Placement Unit. 5/11/98 Tr. 102. Due to his disability and the increased reliance on paperwork, plaintiff felt that he was unable to accomplish his assignments without certain accommodations. As such, soon after his reassignment to the Placement Unit, plaintiff asked for clerical assistance, a Dictaphone, a computer, and training in the use of that computer.

Plaintiff's supervisor, Melody Johnson, initially told plaintiff that, apart from the dictaphone, he was asking for too much, and that he would have to wait until the National Rehabilitation Hospital ("NRH") evaluated his job and his need for accommodation. Approximately one month after plaintiff's request for accommodations, in November 1993, the NRH spent nearly eight hours conducting an evaluation of plaintiff. This evaluation involved interviews with both plaintiff and his supervi-

sor, as well as time spent "shadowing" plaintiff while he was at work in order to assess his duties. The NRH issued a report and recommended that DHS provide certain accommodations to plaintiff.

Defendants assigned clerical help to plaintiff beginning in March 1994, four months after the NRH report and recommendation. Additionally, plaintiff received computer training in early 1994. However, plaintiff was unable to use this training, for he did not receive a computer with the proper software until December 1994, over one year after his request. Plaintiff also requested that a reader/writer service assist him while learning to use the computer, a service which did not become available until March 1995.

The Rehabilitation Act of 1973 prohibits discrimination on the basis of disability against federal employees and employees of recipients of federal funds. 29 U.S.C. § 701, *et seq.* (1994). Similarly, the ADA prohibits discrimination against a qualified individual because of the individual's disability in regard to application procedures, advancement, job training and other terms and conditions of employment. 42 U.S.C. § 12112(a) (1994). The ADA also defines discrimination to include failure to make reasonable accommodations for a known disability absent undue hardship to the employer. *Id.* § 12112(b)(5)(A).

In this case, it is undisputed that plaintiff has a disability and that he has a right to be reasonably accommodated for his disability. Specifically, plaintiff has a visual impairment, which inhibits his ability to focus on written work, causes his eyes to tear when he strains them, and prevents him from seeing under certain conditions, such as natural or harsh light. Plaintiff concedes that the District of Columbia eventually accommodated his visual disability, but claims that defendants unlaw-

fully delayed their attempts at accommodation.

As previously stated, plaintiff is required to exhaust his administrative remedies before bringing this civil suit. As a general rule, an ADA claim must be based upon specific instances of misconduct of which the EEOC is made aware within the statutorily-prescribed time. *Shehadeh,* 595 F.2d at 724. Plaintiff is precluded from raising claims that were not mentioned in his EEOC complaint or which could not have been expected to "grow out of his administrative charge." *Mayfield v. Meese,* 669 F.Supp. 1123, 1127 (D.D.C.1987). The correct rule to follow in construing EEOC charges for purposes of delineating the proper scope of a subsequent judicial inquiry is that "the complaint in the civil action ... may properly encompass any ... discrimination like or reasonably related to the allegations of the charge and growing out of such allegations." *Danner v. Phillips Petroleum Co.,* 447 F.2d 159, 162 (5th Cir.1971); *see Jenkins v. Blue Cross,* 538 F.2d 164, 167 (7th Cir.1976). The D.C. Circuit has stated that the purpose of the administrative complaint is to afford the agency a "reasonable opportunity to investigate violations assertedly committed by the putative defendant." *Shehadeh,* 595 F.2d at 728. However, the Circuit has also acknowledged that an EEOC complaint should be construed liberally. *Id.* at 727.

Plaintiff filed his charge of discrimination with the EEOC on September 17, 1993. The complaint alleges retaliation and intentional disability and physical appearance discrimination occurring at the Vending Facilities Program, promulgated by defendants Hill, Mesmer and Williams.

Here, plaintiff is contending that defendants failed to accommodate his disability after his transfer back to the Placement Unit. All of defendants' actions that plaintiff claims violated his rights to accommodation occurred after his initial EEOC complaint was filed. Discriminatory actions that occur after the filing of an EEOC complaint may still fall within the scope of the administrative complaint. *See Clockedile v. New Hampshire Dept. of Corrections,* 245 F.3d 1, 5 (1st Cir.2001); *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 465–66 (5th Cir.1970). However, in order for this exception to apply, plaintiff's accommodation claim must sufficiently be related to the original EEOC complaint such that, were the Commission to investigate charges outlined in the complaint, it would discover the misconduct allegedly occurring subsequent to the filing of the complaint. *Clockedile,* 245 F.3d at 5.

Even liberally construed, plaintiff's EEOC complaint does not contain any facts that would prompt a reasonable investigation, which would uncover evidence of plaintiff's failure to accommodate claim. The contents of plaintiff's EEOC complaint relate to activities conducted by different people, in a different office, ranging from one to six years earlier. Accordingly, the Court finds that a reasonable investigation conducted by the EEOC would not have uncovered the failure to accommodate of which plaintiff complains. It would be unreasonable to conclude that the EEOC, while investigating the original charge of discrimination, would investigate conduct occurring at the Placement Unit or the actions of Melody Johnson. Furthermore, plaintiff's EEOC complaint asserts claims of retaliation and and disability and physical appearance discrimination; it wholly fails to suggest that defendants had failed to reasonably accommodate his disability.

Plaintiff was entitled to file a new and distinct claim with the EEOC alleging that defendants failed to accommodate his

visual impairment while he was employed at the Placement Unit. Absent this step, the Court concludes that a reasonable EEOC investigation would not unearth defendants' alleged violations of the ADA or the Rehabilitations Act. Plaintiff failed to exhaust his administrative remedies for his failure to accommodate claim. Accordingly, this Court may not properly exercise subject matter jurisdiction over this claim.

### E. Intentional Disability Discrimination

■ Plaintiff also claims that defendants intentionally discriminated against him on account of his disability in violation of the ADA and the Rehabilitation Act. Here, this Court applies the analytical framework of *McDonnell Douglas* to determine whether plaintiff suffered discrimination based on his disability. *See Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C.Cir.1993). In order to establish a prima facie case of disability discrimination, plaintiff must: (1) show that he is a member of a protected class, *i.e.* that he has a disability; (2) that he is qualified to perform the essential functions of the job he holds or seeks with or without reasonable accommodations; (3) that he suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

■ Plaintiff is legally blind and has proven that he is qualified to perform the essential functions of the job he holds, as evidenced by his positive performance evaluations before his reassignment out of the Placement Unit in 1988. As previously stated, plaintiff has suffered adverse employment actions by being reassigned to the Vending Facility and being placed in a storage room without a job description. Plaintiff does not point to any additional adverse employment actions in bringing his claim of intentional disability discrimination. The record contains insufficient evidence of a causal connection between plaintiff's disability and these adverse employment actions claimed by plaintiff. At trial, plaintiff produced absolutely no evidence that would prove that his reassignment to the Vending Facility was motivated by his disability.

Accordingly, the Court finds that plaintiff has failed to prove his claim of intentional disability discrimination against the District of Columbia.

### CONCLUSION

For the foregoing reasons, and upon careful consideration of the entire record herein and the applicable statutory and case law, the Court enters judgment for defendants, and against plaintiff, on all counts. While plaintiff has proven by a preponderance of the evidence that he suffered unlawful retaliation, he failed to file a timely complaint with the EEOC. Therefore, this Court enters judgment for defendants and against plaintiff on plaintiff's claims of retaliation in violation of Title VII and hostile work environment in violation of Title VII. Moreover, this Court finds that plaintiff has failed to prove by a preponderance of the evidence that the defendants unlawfully and intentionally discriminated against him in violation of Section 1983, or that defendants intentionally discriminated against him because of his disability in violation of the ADA and the Rehabilitation Act. Accordingly, the Court enters judgment in favor of the defendants and against plaintiff on these claims. Finally, this Court enters judgment for defendants and against plaintiff on plaintiff's failure to accommodate claim because plaintiff failed to exhaust his administrative remedies.

An appropriate Order and Judgment accompanies this Memorandum Opinion.

### *ORDER AND JUDGMENT*

Pursuant to Federal Rule of Civil Procedure 58 and for the reasons stated by the Court in its Memorandum Opinion docketed this same day, it is hereby

**ORDERED AND ADJUDGED** that the Clerk shall enter final judgment in favor of defendants and against plaintiff on all counts; and it is

**FURTHER ORDERED** that this case is closed.