Cleo DICKERSON, et al., Plaintiffs,

v.

SECTEK, INC., et al., Defendants.

No. CIV.A. 01–0877(ESH).

United States District Court, District of Columbia.

Nov. 13, 2002.

Shannon M. Salb, Lippman & Semsker, PLLC, Bethesda, MD, for plaintiffs.

Robert Lawrence Bredhoff, Stein, Mitchell & Mezines, Washington, DC, Wilma Antoinette Lewis, Ellen Moran Dwyer, Crowell & Moring, L.L.P., Washington, DC, Steven William Ray, Edward Lee Isler, Ray & Isler, P.C., Vienna, VA, for SecTek, Inc., defendant.

Robert Lawrence Bredhoff, Stein, Mitchell & Mezines, Washington, DC, Ellen Moran Dwyer, Crowell & Moring, L.L.P., Washington, DC, for Thomas Smith, defendant.

### MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiffs TaWanda Waters, Cleo Dickerson, and Angela Reed claim that their employer, SecTek, Inc. ("SecTek"), and their former supervisor, Thomas Smith, engaged in disparate treatment discrimination based on sex, hostile work environment harassment, and retaliation in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C.Code § 2–1401 et seq. Defendants have moved for summary judgment on all three counts. As to disparate treatment, defendants argue (1) that plaintiffs have failed to demonstrate adverse employment action; (2) that plaintiffs cannot demonstrate that they were treated differently than similarly situated male employees; and (3) that plaintiffs cannot establish that defendant's nondiscriminatory reasons for their employment actions were a pretext for discrimination. As to retaliation, defendants assert (1) that any adverse personnel action was taken before plaintiffs had engaged in statutorily protected activity; and (2) that plaintiffs suffered no adverse employment action as a result of the alleged retaliatory harassment. Finally, as to hostile environment, defendants assert (1) that the conduct about which plaintiffs complain falls short of the kind of severe or pervasive conduct actionable under the DCHRA; and (2) plaintiffs have no evidence demonstrating that the alleged harassment was based on their sex.

For the reasons given below, the Court will grant defendant's motion for summary judgment as to the disparate treatment and retaliation claims, but not as to the hostile work environment claim.

### BACKGROUND

Defendant SecTek is a private security company that contracts with government and commercial clients to provide security services. In July 2000, SecTek received a contract to provide security services to the National Imagery and Mapping Agency ("NIMA"), a federal agency involved in intelligence gathering and processing. The contract requires SecTek to provide complete security coverage to all posts at the NIMA site at all times. Work under the contract began on September 1, 2000.

Plaintiffs Waters, Dickerson, and Reed had worked as security guards at the NIMA site under the incumbent security contractor. The SecTek contract contained a "right-of-first-refusal" clause requiring that SecTek offer positions to incumbent employees. On that basis, SecTek hired Waters, Dickerson, and Reed to do the same jobs at NIMA that they had done for the previous contractor. Waters was therefore employed as Captain of the guard-force, while Dickerson and Reed served as Waters' lieutenants. (Def.'s Statement of Material Facts [Defs.' Stat.] ¶ 5.) Defendant Smith, who was not an incumbent employee, was hired to serve as the Program Manager, and as such, he was the overall manager of the NIMA location and SecTek's primary on-site interface with NIMA. (Id.). In that capacity, he supervised the three plaintiffs. (Id. at ¶ 10.) Waters, as Captain, ranked immediately below Smith in the chain of command and was the direct supervisor of Dickerson and Reed. (Id. at ¶¶ 10–11.) All four of these individuals were designated in the contract as "key personnel," which meant that their appointments had to be approved by NIMA

and that they had special responsibilities to ensure that the terms of the contract were met. (*Id.* ¶ 6; Def.'s Ex. 7 (Dickerson Dep.) at 33–34.) In addition, Waters, Dickerson, and Reed served as shift supervisors: Waters was in charge of the day shift, Dickerson ran the night shift, and Reed supervised the swing shift. (*Id.* at ¶ 7.)

SecTek placed all of its new employees on a 90–day introductory probationary period. (*Id.* at ¶ 9.) The company subsequently extended this period for another 45 days for Waters, Dickerson, and Reed; the parties dispute whether it imposed a similar extension with respect to all employees or whether the extension applied only to plaintiffs. ( *Compare id. with* Pls.' Statement of Material Facts ["Pls.' Stat."] ¶ 84.) During the first months of the NIMA contract, SecTek experienced staffing shortages, which required each of the plaintiffs to put in considerable overtime. (*Id.* at ¶¶ 13–16.) During this time, Bruce Moore, SecTek's Vice President of Operations, reported to the company's president, Edward Rhodes, that there were problems with the management team of Smith, Waters, and Dickerson. Moore believed that the team was "dysfunctional" and was not doing its job properly. (*Id.* at ¶ 20.) At times in late 2000 and early 2001, Moore actually considered taking formal action against Waters and Dickerson. He drafted letters to NIMA, recommending their termination based on several acts of alleged malfeasance. (Defs.' Ex. 16; Pls. Ex. 22.) These letters, however, were never sent. (Pls.' Stat. ¶¶ 90–91; Defs.' Mot. at 9.)

Conflict was also brewing from within the team. Specifically, Smith found fault with the performance of Waters and Dickerson. He believed that Waters was not completing her job assignments well and that she was undermining his authority by discussing operational information directly with NIMA. He believed Dickerson to be insufficiently diligent and not a proactive supervisor. (Defs.' Mot. for Summ. J. [Mot.] at 7; Defs.' Ex 10 at 52–53, 233–34.) At the same time, plaintiffs—in particular Reed—complained about Smith's hostile attitude toward them and his use of inappropriate language (Pls.' Stat. ¶¶ 27, 33 (plaintiffs allege that Smith frequently used the word "bitch" and referred to them as "chicks").)

On December 20, 2000, Smith removed some of Waters' scheduling and supervisory authority, and reassigned her from the day shift to the rover post, the post that Smith had been covering. This reassignment lasted for approximately two weeks; during that time, another SecTek employee took charge of the day shift. Waters' pay and benefits were not affected by this temporary change, and she did not lose her title of "captain." After two weeks, Waters was returned to her normal supervisory responsibilities on the day shift. (Pls.' Stat. ¶¶ 55–58; Defs.' Mot. at 9–10.)

In late January 2001, Smith suspended Waters and Dickerson pending further investigation of their performance. (Defs.' Stat. ¶ 21.) After an investigation conducted by Cynthia Cherry, SecTek's Director of Human Resources, the company determined that the reasons given by Smith were insufficient to justify the suspensions. Accordingly, SecTek rescinded the suspensions and reinstated plaintiffs. (*Id.* at ¶ 22.) Dickerson returned to work on February 6, 2001; Waters on February 9. Eventually both received back pay at their previous salary for the time that they missed on account of the suspensions. (*Id.* at ¶¶ 23–24; Defs' Ex. 18 (Blood Aff.) Attach. A & B.) When Waters and Dickerson were reinstated, however, they were reinstated as duty officers, as opposed to

supervisors, and were paid accordingly. (Defs.' Ex. 9 (Cherry Dep.) 193.)

By letter dated February 14, Rhodes reported to NIMA the results of the investigations, noting that while the suspensions were not deemed justified, he continued to have concerns about Dickerson and Waters' performance. (Def's Stat. ¶ 25.) Soon thereafter, Rhodes decided to remove Waters and Dickerson, as well as Smith, from their respective supervisory positions. (*Id.* at ¶ 26.) Though Rhodes has averred that he informed NIMA of this decision at a February 15 meeting with the agency, defendants dispute this contention. (Pls.' Response to Defs.' Stat. ¶ 27.) Waters and Dickerson were both demoted to non-supervisory positions and remained on the NIMA site. Smith was reassigned to SecTek headquarters. (Defs.' Stat. ¶¶ 27–28.) On February 16, 2001, plaintiffs' counsel advised Cherry by letter that plaintiffs believed that they were being subjected to gender discrimination by Smith and were contemplating legal action. (*Id.* at ¶ 29.) On April 12, Dickerson was returned to her previous position of Lieutenant. Likewise, on July 9, Waters was returned to the position of Captain on the recommendation of the new Project Manager, James Poppino. (Defs.' Mot. 12.)

On March 23, 2001, plaintiff filed suit against SecTek and Smith in the Superior Court for the District of Columbia. Defendants successfully removed the case to this Court on the basis of diversity of citizenship. In their amended federal complaint, plaintiffs assert three claims under the DCHRA. Count I alleges that defendants discriminated against plaintiffs on the basis of gender. (First Am. Compl. ¶ 29.) Count II alleges that defendants created a hostile work environment. (First Am. Compl. ¶ 32.) Count III alleges that defendants engaged in illegal retaliation against plaintiffs by demoting Waters and Dickerson in response to their internal complaints of discrimination and by harassing all three plaintiffs about their ongoing discrimination litigation. (First Am. Compl. ¶¶ 35–36.) Defendants have now moved for summary judgment on all three counts.

## LEGAL ANALYSIS

### I. Standard of Review

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine, and should preclude summary judgment, if a reasonable jury could return a verdict in favor of the non-moving party. *Id.* In contrast, a moving party is entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse v. District of Columbia,* 298 F.3d 989, 992 (D.C.Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Washington Post Co. v. U.S. Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir.1989). However, the nonmoving party's opposition must consist of more than mere unsupported

allegations or denials and must· be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Therefore, the court "must assume the truth of all statements proffered by the party opposing summary judgment"—except for wholly conclusory statements for which no supporting evidence is offered. *Greene v. Dalton,* 164 F.3d 671, 674–75 (D.C.Cir. 1999).

## II. Count I: Disparate Treatment Discrimination

### A. *Legal Standard: The* Prima Facie *Case and Burden Shifting*

■ The legal standard for discrimination under the DCHRA is substantively the same as under Title VII. *See Knight v. Georgetown Univ.,* 725 A.2d 472, 478 n. 5 (D.C.1999) (noting that the same body of law is used to construe both provisions); *Daka v.· Breiner,* 711 A.2d 86, 94 (D.C. 1998) (noting that the D.C. Court of Appeals "in deciding issues arising under the DCHRA, consistently relies upon decisions of the federal courts in Title VII cases as particularly persuasive authority"). Thus, as under Title. VII, in order to state a *prima facie* case of gender discrimination under the DCHRA, plaintiff .must establish: (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination. *Brown v. Brody,* 199 F.3d 446, 452 (D.C.Cir.1999). To prevail, therefore, the plaintiff must demonstrate that her employer took some adverse action because of her membership in the statutorily protected group. *See Forkkio v. Powell,* 306 F.3d 1127, 1130–31 (D.C.Cir.2002).

■ Actions short of an outright firing can be adverse, but not all personnel deci-

sions with negative consequences for the employee necessarily satisfy the second part of the *prima facie* case. To count, the action must have had "materially adverse consequences affecting the terms, conditions, or privileges of employment or her future employment opportunities." *Brody,* 199 F.3d at 457. This means that actions imposing purely subjective harms, such as dissatisfaction or humiliation, are not adverse. *See Forkkio,* 306 F.3d at 1130–31; *see also Brody,* 199 F.3d at 457 ("Mere idiosyncrasies of personal preference are not sufficient to create an injury."); *Childers v. Slater,* 44 F.Supp.2d 8, 19 (D.D.C.1999) ("[C]onduct that sporadically wounds or offends but does not hinder an employee's performance does not rise to the level of adverse action."), *modified on reconsideration,* 197 F.R.D. 185 (D.D.C.2000); *Jones v. Billington,* 12 F.Supp.2d 1, 13 (D.D.C.1997) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.") (citation and quotation marks omitted).

■ Instead, there must be some objective harm: "a tangible change in the duties or working conditions constituting a material employment disadvantage." *Walker v. WMATA,* 102 F.Supp.2d 24, 29 (D.D.C. 2000) (citation and quotation marks omitted); *see also Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Paradigmatically, this means discharge, but actions such as demotion, undesirable reassignment, or the loss of a bonus can also count as adverse. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 808, 118 S.Ct. 2275,

141 L.Ed.2d 662 (1998); *Russell v. Principi*, 257 F.3d 815, 819 (D.C.Cir.2001).

Once a plaintiff establishes a *prima facie* case, this creates a presumption of discrimination that the defendant may rebut by producing evidence that the adverse employment action was taken for "a legitimate, nondiscriminatory reason." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C.Cir.1998) (*en banc*). The defendant's burden here is to produce, not to persuade, and therefore the Court is not to make credibility assessments at this stage of the analysis. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the defendant carries this burden, the plaintiff then must show that the legitimate reason offered by the defendant was in fact a pretext for unlawful discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

█ At this final stage, there is no longer any inference of discrimination, but the plaintiff, in attempting to demonstrate that the employer's "proffered explanation is unworthy of credence," may still rely on evidence from its *prima facie* case and inferences properly drawn therefrom. *Id.* at 255–56 & n. 10, 101 S.Ct. 1089; *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097. To defeat summary judgment, the plaintiff must establish—through the combination of its *prima facie* case, evidence introduced to show that the defendant's explanations were pretextual, and any further evidence of discrimination by the employer—that a reasonable jury could find that the plaintiff suffered the adverse employment action for a discriminatory reason. *See Waterhouse*, 298 F.3d at 992–93; *Aka*, 156 F.3d at 1289. In certain cases, but not always,

"a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false," will be sufficient to defeat summary judgment. *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097.

### B. *Plaintiff Reed's Discrimination Claim*

As indicated above, the first step for any plaintiff seeking to make out a *prima facie* case of gender discrimination is to point to some "adverse action" taken against her by her employer. In the absence of such action, plaintiff cannot prevail. In this case, plaintiff Reed contends that she suffered three separate adverse actions: (1) her "demotion" in October 2000; (2) her exclusion from the Emergency Response Team ("ERT") that was formed to handle security issues arising out of the Presidential Inauguration in January 2001; and (3) being required, upon pain of termination, to work extensive overtime. (Pls.' Opp. at 41–42.) The Court will consider each of these allegations seriatim.

█ Reed's alleged demotion occurred when she arrived at work to discover that she had been scheduled to sit on a regular post on the day shift instead of her normal position as supervisor of the swing shift. (Defs.' Ex. 6 (Reed Dep.) at 50.) While the Court agrees with plaintiff that even a temporary transfer from a supervisory position to a non-supervisory one could constitute an adverse employment action, the decision at issue here is not such an action because Reed's own testimony makes clear that the scheduling change never went into effect. The change was not effective immediately, but was only supposed to occur the day *after* Reed learned of it. Until then, Reed served in her normal role as shift supervisor. (*Id.* at 55–56.)

However, when Reed arrived the next day, she learned that she had been placed

back on the swing shift in her original supervisory role. (*Id.* at 59–60.) Reed thus never missed a day as supervisor. (*Id.* at 65.) Her position never actually changed as a result of this unimplemented scheduling shift. Neither did her level of compensation or her title. (*Id.* at 67.) Reed's only harm, if any, was physiological—the stress that she endured when faced with the prospect of losing her position. (*Id.* at 68.) But such harm is not the kind of material harm that the DCHRA demands, but rather the sort of vague, subjective harm that this Circuit has repeatedly rejected as insufficient. *See Stewart v. Evans,* 275 F.3d 1126, 1135 (D.C.Cir.2002) (no adverse employment action where no change in position, grade, pay, or benefits); *Forkkio,* 306 F.3d at 1130–31 ("Purely subjective injuries ... are not adverse employment actions."). In sum, then, the effect of Reed's demotion (if it can be called that) was simply never felt. It was an hypothetical employment action, not an actual one, and thus does not satisfy the requirements of the *prima facie* case. *See Pennington v. City of Huntsville,* 261 F.3d 1262, 1267 (11th Cir.2001) (holding that "the decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action").

█ Reed's allegations about the ERT fail for a different reason. According to Reed, employees chosen for the team were paid for their service. (Pls.' Stat. ¶¶ 62–63.) She thus analogizes it to a kind of bonus, the denial of which can constitute an adverse employment action. *See Russell,* 257 F.3d at 819. Reed contends that Smith chose the members of the task

force, deliberately excluding female officers, thereby violating the DCHRA. (Compl. ¶ 12; Pls.' Opp. at 44). This claim cannot survive summary judgment because plaintiff has adduced no evidence that membership in the ERT was at all exclusive and no evidence that information about joining was deliberately withheld from her. She therefore has not satisfied the requirement of adverse employment action.[1]

Smith testified that the ERT was comprised of volunteers, and that any officer could join if he or she expressed a desire to do so. (Pls.' Ex. 8 (Smith Dep.) at 183 ("No, it's not about getting on; it's volunteering."); *id.* at 186 ("It was all volunteer. You show up if you want to.").) It is not clear how a plaintiff's non-participation in a non-selective body could amount to employer "action" at all, much less the kind of adverse employment action necessary to trigger liability under the DCHRA. In the absence of any affirmative indication that Reed was prevented from joining the ERT—such as evidence of Smith's deliberate complicity in her ignorance of the team's existence—she cannot prevail.

Unfortunately, Reed does not offer this evidence; she notes only that another (male) officer reported that Smith invited him to participate. (Pls.' Stat. ¶ 67.) But the fact that some officers may have been specifically asked to participate does nothing to suggest that the membership was somehow selective or by invitation only. It is quite common for particular individuals to be asked to join a group that nonetheless remains open to all. And, while Reed testified that she felt like she was

---

**1.** While this holding is based largely on the lack of evidence that there was employment *action* at all, Reed's own testimony casts doubt on whether any possible action here would have been "adverse." Plaintiff testified that she suffered "no harm" as a result of not serving on the ERT. (Defs.' Ex. 6 (Reed Dep.) 155.) In the face of this admission, it is far from clear how a reasonable jury could conclude that Reed faced an *adverse* employment action even if she had been deliberately refused admission onto the team.

being deliberately excluded (Pls.' Ex. 14 (Reed Dep.) at 146), she produces nothing in the record to support this feeling, nor any evidence that Smith purposely withheld information about the ERT from her. The most that she can say is that she "had no knowledge" about the team until the day before the Inauguration. (*Id.* at ¶ 64.) This is simply not enough to establish a *prima facie* case.[2]

■ Perhaps recognizing this difficulty, Reed points to Smith's statement that the reason Reed was not on the team was because she was running her normal shift on the day of the Inauguration. (Pls.' Ex. 8 (Smith Dep.) at 187–88.) This is not enough. For, even assuming that an employer's observation that an employee's normal responsibilities prevent her from taking on a special assignment *could* be adverse employment action,[3] Reed cannot overcome defendant's obvious and legitimate explanation for that action. It is undisputed that Reed worked her normal shift on the day of the Inauguration.[4] (Pls.' Ex. 14 (Reed Dep.) at 146.) And it is perfectly reasonable for an employer to insist that an employee comply with her normal work schedule in lieu of signing up for an extra detail. Thus, even if Reed had somehow been prevented from serving on the team, defendants have offered an entirely legitimate reason for that action, and plaintiff adduces no evidence to demonstrate that this reason was a pretext for gender-based exclusion from the ERT. *See, e.g., Forman v. Small*, 271 F.3d 285, 293–94 (D.C.Cir.2001) (affirming dismissal of age discrimination claim where plaintiff failed to show that defendant's reasons for denying his promotion were pretextual); *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1080 (D.C.Cir.1999) (no discrimination found where plaintiff did not even attempt to impugn defendant's stated reason for firing him); *Childers*, 44 F.Supp.2d at 22 ("The plaintiff's mere assertion of a pretext does not suffice to withstand the defendant's motion."). Accordingly, Reed's discrimination claim based on her non-participation in the ERT cannot survive summary judgment.

■ The third adverse employment action that Reed alleges is Smith's requirement that she (along with Dickerson and Waters) work overtime on pain of termination if they refused. She contends that only female employees were required to work overtime, whereas SecTek's male guards could chose to do so at their discretion and convenience. (Pls.' Stat. ¶¶ 73–74; Pls.' Opp. at 45.) Even assuming that differential treatment with respect to overtime hours can be an adverse employment action,[5] Reed still cannot establish a *prima*

---

2. This analysis also applies to—and dooms—the discrimination claims made by plaintiffs Dickerson and Waters based on defendants' alleged refusal to allow them on to the ERT.

3. The validity of this assumption is far from obvious and, at least in this case, is significantly undermined by Reed's own testimony. At her deposition, plaintiff acknowledged that she never actually asked Smith for a place on the ERT. "I didn't feel the desire to ask him or to say yes, I would like to be part of it. I never did say that I wanted to." (Pls.' Ex. 6 (Reed Dep.) at 146.) In light of this admission, there is little basis for concluding that Smith used Reed's regularly scheduled shift as an excuse for not allowing her onto the team. Smith's conduct with respect to Reed's membership in the ERT thus looks less like adverse action and more like neutral passivity.

4. Moreover, because Reed worked that day, the most she could have lost by not joining the ERT was the difference between one day's pay and one day's overtime pay. Such a difference could well be described as a *de minimus* loss of pay, which does not rise to the level of adverse action. *See Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir.2000).

5. This is an entirely plausible assumption. An employer's unforeseen mandate that an

*facie* case. To do so, she must show that defendant's overtime requirements applied only to female employees, and not to similarly situated male employees. *See Robinson v. Detroit News, Inc.,* 211 F.Supp.2d 101, 112–13 (D.D.C.2002) (to make out a prima facie case under the DCHRA, "the plaintiff bears the burden of proving that the male employees were similarly situated and then treated unequally"); *O'Donnell v. Assoc. Gen. Contractors of Am.,* 645 A.2d 1084, 1089 (D.C.1994) (in establishing *prima facie* case, plaintiff required to show that she was treated differently from similarly situated male employees). Plaintiff has failed to carry this burden.

Reed (like her co-plaintiffs and unlike the male officers to whom they seek to compare themselves) was specifically designated as "key personnel" in the NIMA contract and as shift supervisors. (Defs.' Stat. ¶ 6.) Accordingly, they carried more contractual obligations to cover posts and ensure that positions were covered than did those male officers. Indeed, plaintiff Dickerson testified that as key personnel, she (along with her co-plaintiffs) had greater responsibilities to ensure effective implementation of the NIMA contract than did employees not so designated. "As key personnel, I feel as though ... we have more responsibilities to the contract than the officers, of course, and the sergeants *as far as filling the posts, working overtime if we had to.* I realize we have to go an extra mile than—more so than the officers and the sergeants and the supervisors." (Defs.' Ex.7 (Dickerson Dep.) at 34–35 (emphasis added).)

Reed has put forward no evidence that any male employees with similar responsi-bilities were exempted from the overtime demands that she faced. Instead, she points only to plaintiffs' own statements that certain male *sergeants* were not required to work overtime, but instead were permitted to decide when and how much overtime they wished to work. (Pls.' Stat. ¶ 73.) But these men were in no sense similarly situated, and thus whatever their overtime demands were, Reed cannot use their situation to establish a *prima facie* of discrimination. *See Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C.Cir.1995) (in order to show that she was "similarly situated," plaintiff "required to demonstrate that all of the relevant aspects of her employment situation were 'nearly identical' to those of the male associate") (quoting *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994)); *see also Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1554 (D.C.Cir.1997) (same).

Moreover, even if Reed could establish a *prima facie* case, a similar problem prevents her from rebutting the legitimate reason that defendants have offered for requiring plaintiff to work overtime. *See Waterhouse,* 298 F.3d at 994 (quoting *Reeves,* 530 U.S. at 140, 120 S.Ct. 2097) (plaintiff carries burden of presenting "sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation" for taking the adverse employment action). Again, SecTek points out that as key personnel, Reed (along with the other plaintiffs) had special responsibilities under the contract, including the requirement to work overtime when necessary to ensure that no posts were left open. And, in the first months of the

employee work overtime whenever the employer requires it could affect the "terms, conditions, or *privileges*" of employment, *Brody,* 199 F.3d at 457 (emphasis added), and thus could be described as adverse employ-ment action. *See, e.g., Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 818–19 (9th Cir.2002) (holding that Title VII claims of disparate treatment based on "discriminatory overtime" survive summary judgment).

NIMA contract, it is not disputed that SecTek was chronically understaffed, which placed great demands on the entire guard-force and made overtime common.[6] (Defs.' Stat. ¶ 13.) Moreover, Reed acknowledged that she was never required to put in overtime except in situations when there was an actual need for her services. (Ex. 6 (Reed Dep.) at 182–83 ("Q. 'So you were never called in and there was really not a legitimate open post situation for you to work. Is that correct?' A. 'Yes.'").)

These facts establish a legitimate reason for Reed's mandated overtime, suggesting that the requirement was one of business necessity and was based on Reed's special employment status, rather than on account of her gender. The Circuit has held that a plaintiff's attempts to show that her employer's explanation is a pretext for discrimination are seriously undermined if those to whom she compares her treatment were not similarly situated. *See Waterhouse*, 298 F.3d 989, 995–96 (D.C.Cir. 2002); *McGill v. Munoz*, 203 F.3d 843, 848 (D.C.Cir.2000). Reed cannot take her case of pretext to a jury merely by pointing to overtime requirements imposed on guards who lacked her unique contractual responsibilities. Thus, because she has presented no evidence that employees of her same rank and authority were exempted from overtime requirements, Reed is unable to carry her burden of creating a genuine issue of fact as to whether defendant's explanation is a pretext for unlawful discrimination.

For these reasons, the Court will grant defendant's motion for summary judgment with respect to plaintiff Reed's claims of disparate treatment discrimination under the DCHRA.[7]

### C. *Plaintiffs Dickerson and Waters' Discrimination Claims*

Dickerson and Waters' discrimination claims must be analyzed separately because they put forward two bases for a *prima facie* case not asserted by Reed.[8] First, plaintiffs point to Smith's decision in late January 2001 to suspend Dickerson and Waters pending an investigation of their conduct. (Pls.' Ex. 10 (Smith Dep.) at 307; Pls.' Ex. 17.) Second, they invoke SecTek's subsequent decision, in February 2001, after their suspensions had been rescinded, to remove them from their supervisory positions and to assign them to serve as ordinary officers, with correspondingly diminished pay. (Pls.' Opp. at 42–43.)

---

6. Indeed, Reed does not contend that she actually worked more overtime hours than the lower-ranked male officers. What evidence there is in fact indicates that Reed actually worked *fewer* hours than Sergeant Clifford Johnson, one of those to whom plaintiff seeks to compare herself. (Defs.' Stat. ¶¶ 16–17.)

7. The Court addresses Reed's claim of hostile work environment discrimination together with those of her co-plaintiffs in Section III, *infra*.

8. Like Reed, Dickerson and Waters claim that they suffered adverse employment actions by being excluded from the ERT and by being forced to work overtime. The latter claim can be disposed of on the same grounds as the overtime claim made by Reed. As to the allegations about the ERT, while Dickerson and Waters (unlike Reed) did not work the day of the Inauguration, they (like Reed) have failed to show that the team was anything other than a voluntary force, that they tried to get on and were prevented from doing so, or that defendants deliberately withheld information from them about the existence of the ERT in order to keep them from joining. (Pls.' Ex. 13 (Dickerson Dep.) at 153 (Dickerson learned about ERT before the Inauguration, but did not inquire further); Pls.' Ex 4 (Reed Dep.) at 114–15.) As such, they too have failed to establish that their non-participation constituted an adverse employment action.

First, the suspensions. According to plaintiffs, these suspensions were Smith's own doing; he issued his orders without first consulting SecTek management. (Pls.' Stat. ¶ 106.) When it learned of the suspension, SecTek conducted an investigation, led by Director of Human Resources Cynthia Cherry, who concluded that there were insufficient grounds for the suspensions on the limited bases that Smith had given for them. (Pls.' Ex.6 (Cherry Dep.) 157; Defs.' Ex. 18 (Blood Aff.) ¶ 4; Defs.' Ex.19.) Accordingly, the suspensions were rescinded, and Dickerson and Waters returned to work on February 6 and 9 respectively. (Defs.' Ex. 18 (Blood Aff.) ¶¶ 4–5.) On February 23, their next pay date, plaintiffs were paid for the time they had missed because of the suspension, at their normal supervisors' rate. (Id. at ¶ 5 & Attachs. A (payroll record for Waters) and B (payroll record for Dickerson).)

Plaintiffs assert that a suspension is an adverse employment action under any circumstances, but the case law reveals that this proposition is far from clear. Here, plaintiffs were placed on administrative suspension, and after being absolved they were compensated for the time that they had missed. In similar circumstances, a number of courts have found that when an employee is placed on paid administrative leave or suspended pending an internal investigation, that decision does not constitute adverse employment action, at least when the suspension is relatively brief. *See Myart v. Doubletree Hotels Corp.,* 2002 WL 63814, at *5 (N.D.Ill. Jan.17, 2002); *Prickett v. Amoco Oil Co.,* 147 F.Supp.2d 1147, 1158 (D.Utah 2001); *Lauderdale v. City of Arlington,* 2002 WL 236673, at *10 (N.D.Tex. Jan 31, 2002); *Jackson v. City of Columbus,* 67 F.Supp.2d 839, 865 (S.D.Ohio 1998), *aff'd in part & rev'd in part,* 194 F.3d 737 (6th Cir.1999), *abrogated on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). In contrast, however, other courts have held that such suspensions can constitute adverse employment actions, even if the employee is later reinstated and receives full back pay covering the lost wages. *See Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 223–24 (2d Cir.2001); *Roberts v. Roadway Exp., Inc.,* 149 F.3d 1098, 1104 (10th Cir.1998) ("Actions such as suspensions or terminations are by their nature adverse, even if subsequently withdrawn."); *Turner v. Marshall Field & Co.,* 1999 WL 168465, at *8 (N.D.Ill. Mar.18, 1999).

Several factors in this case lead the Court to conclude that the suspensions here were not adverse employment actions. First, plaintiffs were compensated for their missed time in their next pay cycle so they did not miss a single pay period. (Defs.' Ex. 18 (Blood Aff.) ¶ 5.)[9] As such, they were deprived of neither their ultimate wages nor the immediate

9. Plaintiffs suggest that they were not initially paid for the time they were suspended at their supervisor's salaries. (Pls.' Response to Defs.' Stat. ¶¶ 23–24.) For this proposition, they cite the testimony of James Poppino, who served as SecTek's Program Manager after Smith was demoted. It was through Poppino's efforts that Dickerson and Waters were ultimately returned to their supervisory positions several months after their February demotions. While Poppino testified that he secured back pay for plaintiffs at that time, he is almost certainly referring to back pay for the time after plaintiffs were demoted (*i.e.* after they returned from their suspensions and paid as ordinary officers). (Pls.' Ex. 7 (Poppino Dep.) at 152; Pls.' Ex 13 (Dickerson Dep.) at 129–31.) The actual payroll records, which plaintiffs do nothing to rebut, show that plaintiffs were compensated at the supervisors' rates for the days when they were suspended. (Defs.' Ex. 18 (Blood Aff.) Attachs. A and B.)

use of those wages. *Accord Lovejoy–Wilson,* 263 F.3d at 224 (finding adverse action from week-long suspension where plaintiff "may have at least suffered the loss of the use of her wages for a time"); *cf. Markel v. Bd. of Regents of Univ. of Wisc. Sys.,* 276 F.3d 906, 911 (7th Cir.2002) ("Typically, adverse employment actions are *economic* injuries such as dismissal, *suspension,* failure to promote, or diminution in pay.")(quoting *Ellerth,* 524 U.S. at 761–62, 118 S.Ct. 2257 (emphases added)).

Moreover, there is no indication that the suspension served, or could have served, as the basis for any subsequent adverse action against plaintiff. *See Russell,* 257 F.3d at 819–20 (holding that "an unrealized risk of future adverse action, even if formalized, is too ephemeral to constitute an adverse employment action"). Indeed, the fact that Dickerson and Reed were cleared of the alleged wrongdoing that led to their suspensions (Defs.' Ex. 19) purged any objective taint from those suspensions.[10] The conclusion that the short-lived suspension had no impact on plaintiffs is further bolstered by the fact that Dickerson and Waters were, in April and July 2001 respectively, returned to their original ranks of lieutenant and captain. (Pls.' Stat. ¶¶ 130–132.; Pls.' Ex 13 (Dickerson Dep) at 128; Pls.' Ex. 36; *supra* note 9.) The Court can thus find no compelling reason to conclude that short suspensions that leave no lasting effect on either the employee's present or future position or her pocketbook are adverse employment actions.[11] A contrary holding would invite "judicial micromanagement" of temporary employment disputes that have already been resolved through internal processes. *Mungin,* 116 F.3d at 1556; *cf. Dobbs–Weinstein v. Vanderbilt Univ.,* 185 F.3d 542, 546 (6th Cir.1999) (finding no adverse employment action where defendant, through internal review, rescinded a potentially adverse decision to deny tenure and gave back pay to compensate for the period when the decision was in effect).

■ Complicating the analysis here, however, is the fact that when plaintiffs returned to work, they were reinstated not as supervisors, but instead as duty officers and were paid accordingly. (Defs.' Ex. 18 (Blood Aff.) ¶ 12.) After February 6 and 9 respectively, therefore, Dickerson and Waters lost the rank and salary they had held before their suspensions. While such demotions are unquestionably adverse employment actions, there is no evidence to suggest that this change in plaintiffs' employment status was in any way related to the suspensions they had received. (Pls.' Ex. 6 (Cherry Dep.) at 173.) Instead, the record suggests that the demotions were linked to SecTek's separate decision—one made not by Smith, but rather by the company's president, Edward Rhodes—to remove Dickerson and Waters, *along with Smith,* from their supervisory positions. (*Id.* at 173–74; Pls.' Ex. 18 (Blood Aff.)

---

**10.** If anyone was tainted by the suspensions, it was Smith. According to Wilfred Blood, Sec–Tek's then-Vice President of Finance and Administration, Smith's unauthorized decision to suspend Dickerson and Waters was one factor that led to his ultimate removal as Program Manager. (Pls.' Ex. 2 (Blood Dep.) at 152.)

**11.** In contrast, courts have almost uniformly held that a disciplinary suspension for which the employee is *not* compensated imposes a tangible harm to employment status and thus amounts to an adverse employment action. *See, e.g., Russell v. Bd. of Trustees of Univ. of Ill. at Chicago,* 243 F.3d 336, 341 (7th Cir. 2001); *Osier v. Broome County,* 47 F.Supp.2d 311, 326 (N.D.N.Y.1999); *Kleckley v. Milwaukee Public Schools,* 20 F.Supp.2d 1264, 1266 (E.D.Wis.1998).

¶ 12.)[12] That is, plaintiffs were stripped of their rank not as a result of being suspended, but because of an unrelated process that had been percolating in the upper echelons of SecTek's management. (Pls.' Ex. 18 (Blood Aff.) ¶ 6 ("SecTek considered the two events to be entirely separated and unrelated.").) Indeed, according to Wilfred Blood, Dickerson and Waters were not returned to their previous positions "because of performance questions that remained from previous incidents." (Pls.' Ex 2 (Blood Dep.) 122.) Blood testified that these questions had been raised by Moore and that Rhodes himself made the decision to return plaintiffs to work as line officers. (*Id.* at 127.)[13]

For these reasons, the failure to reinstate plaintiffs to the supervisory positions they held before the suspensions does not—under the rather unique circumstances of the present case—convert Smith's decision to suspend plaintiffs into adverse employment action. That said, however, there is no dispute that their demotions do constitute adverse action. *See Burke v. Gould,* 286 F.3d 513, 522 (D.C.Cir.2002) ("[W]e have no doubt that the removal of [plaintiff's] supervisory responsibilities constituted an adverse employment action...."). The remaining question, therefore, is whether plaintiffs have made a sufficient showing to create an inference of discrimination with respect to this action. They Court concludes that they have not done so.

Plaintiffs do not explain how any inference of gender discrimination can be drawn where the entire management team—consisting of the two female plaintiffs, as well as Smith, their male supervisor—was subjected to the *same* adverse action. As indicated above, Rhodes demoted all three employees, removing each from their position as supervisor. (Defs.' Ex. 8 (Rhodes Dep.) at 112 ("[I]t was a management team problem really that I had a dysfunctional management team that need replaced [sic] and that included all three and that's why all three went out."); *id.* at 156–57; Ex. 5 (Blood Dep.) at 154 ("I think the consensus was we had a bad management team there ... and our solution to the problem was to remove Smith and demote the first line supervisors.").) The record indicates that SecTek took action against what it perceived to be a team problem, and took action against the team as a unit without regard to gender. Because they have not pointed to any contrary evidence, plaintiffs simply have not demonstrated that they were treated differently from similarly situated men. *See Holbrook v. Reno,* 196 F.3d 255, 261 (D.C.Cir.1999) (such a showing necessary to plaintiff's *prima facie* case).

Similarly, plaintiffs' suggestion that Rhodes' decision was "plainly infected by Smith's discriminatory animus" (Pls.' Re-

---

12. Indeed, on February 14, when Rhodes wrote to NIMA to inform the agency of the results of SekTek's investigation of Dickerson and Waters, he indicated that while the suspensions were not justified, "I continue to have serious concerns about the qualifications of both individuals. We are currently examining the records of each to determine if they should continue to hold these positions." (Defs.' Ex. 19.)

13. There is actually conflicting evidence on this point. In a separate affidavit, Blood averred that the reassignment of Dickerson and Waters to officer positions immediately upon their return from suspension was premature and in error, as it was "contrary to Rhodes' instructions." (Pls.' Ex. 18 (Blood Aff.) ¶ 12.) Nevertheless, what is important here is that there is no suggestion in the record that Smith played any role in the demotion decision or that it was in any way connected with the suspensions that Dickerson and Waters had just served.

sponse to Defs.' Stat. ¶ 26) is seriously undermined by the fact that Smith suffered the same fate as his female co-workers. It would defy logic to argue, as plaintiffs do, that someone with influence over a decision-making process would use that influence to his own detriment. Moreover, even putting this problem aside, plaintiffs have offered no affirmative evidence to support their bare allegation that Smith played a role in Rhodes' decision. (Pls.' Stat. ¶ 124 (suggesting that SecTek made this decision in response to one of NIMA's inquiries); Defs.' Stat. ¶ 26 (suggesting that Rhodes made his decision based on input from Moore, Sec Tek's Vice President).) Indeed, the fact that Rhodes—at the time that he decided to demote plaintiffs—agreed with the report invalidating Smith's reasons for suspending them further indicates Smith's lack of influence over his superiors. (Defs.' Ex. 19.) In the absence of such evidence, and in the total absence of evidence that Rhodes or any of SecTek's upper-level managers harbored any sort of gender-based animus or hostility toward Dickerson and Waters, there is simply no basis on which a reasonable jury could conclude that SecTek's decision to demote plaintiffs was discriminatory.

■ Finally, even assuming *arguendo* that plaintiffs have made out a *prima facie* case, SecTek proffered a legitimate, non-discriminatory reason for their demotions. Plaintiffs have done nothing to rebut SecTek's explanation that they were demoted because Rhodes had reached the conclusion that the management team was dys-

functional, and in order to revive the NIMA contract, "we needed a new team in there." (Defs.' Ex. 8 (Rhodes Dep.) at 159–60.) While plaintiffs suggest that the team's real villain was Smith, and that they should not have been punished along with him (Pls.' Response to Defs.' Stat. ¶ 20), this is not sufficient to rebut Rhodes' non-discriminatory explanation for his actions. In order to prevail on a showing of pretext, it "is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason." *Pignato v. Am. Trans Air, Inc.,* 14 F.3d 342, 349 (7th Cir.1994).

Nothing in the record supports such a conclusion. Even assuming *arguendo* that Smith was a horrendous employee and Dickerson and Waters were exemplary, this does not establish that Rhodes engaged in gender discrimination by treating the three of them as a unit and taking adverse actions against them collectively. As long as Rhodes genuinely believed that the team rose or fell together, his explanations were not pretextual. Plaintiffs have no basis to suggest otherwise. In sum, because plaintiffs have not produced evidence "that the employer did not honestly believe in its stated reasons or had made an error in its decision too obvious to be unintentional," the Court concludes that their discrimination claims cannot survive summary judgment. *Randall v. Howard Univ.,* 941 F.Supp. 206, 212–13 (D.D.C. 1996).[14] Defendants' motion will therefore be granted as to Count I.

---

**14.** Moreover, insofar as defendants assert that the failure to reinstate Dickerson and Waters as supervisors immediately after their suspensions ended was a mistake (Defs.' Ex. 18 (Blood Aff.) ¶ 12), such an explanation is also legitimate for purposes of the burden-shifting analysis. An employer's proffered explanation for its adverse action need not be one that is desirable or attractive. Instead, what

matters is that it explains the action taken against members of a protected group on some basis other than their membership in that group. See *Fischbach v. D.C. Dep't. of Corrections,* 86 F.3d 1180, 1183 (D.C.Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action, ... the issue is not the correctness or desirability of the reasons offered ... but whether

## III. Count II: Hostile Work Environment

 Courts have recognized that certain workplace conditions are so suffused with "discriminatory intimidation, ridicule, and insult" of such severity or pervasiveness as to alter the terms and conditions of employment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). The DCHRA proscribes such conduct. *See Hunter v. Ark Restaurants Corp.*, 3 F.Supp.2d 9, 14 (D.D.C.1998). In order to make out claim for sex discrimination based on a hostile work environment, plaintiff must show (1) that the defendant was engaged in offensive and disparaging conduct; (2) that the conduct was based on sex; and (3) that it was "sufficiently severe or pervasive that a reasonable person in her position would find her work environment to be hostile or abusive." *Bailey v. Henderson*, 94 F.Supp.2d 68, 73 (D.D.C. 2000); *see also Reno*, 196 F.3d at 262. When a hostile environment is created by a supervisor with authority over the plaintiff employee, the employer may be held vicariously liable for such conduct, subject to an affirmative defense available only if no tangible employment action is taken against the employee. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 804–07, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 724, 765, 118 S.Ct. 2257 (1998).

 It is not required that the plaintiff suffer an actual psychological injury, so long as she actually perceived the conduct to be hostile or abusive. *Harris*, 510 U.S. at 22, 114 S.Ct. 367. There is no precise formula for when a working environment becomes so hostile as to be actionable. Instead, all the circumstances must be considered, including the severity of the abuse, whether it is physically threatening, and whether it materially interferes with the employee's performance. *Id.; Curry v. District of Columbia*, 195 F.3d 654, 662 n. 16 (D.C.Cir.1999). "Not all abusive behavior, even when it is motivated by discriminatory animus, is actionable. Rather, a workplace environment becomes 'hostile' for the purposes of Title VII only when offensive conduct 'permeates the workplace with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Barbour v. Browner*, 181 F.3d 1342, 1347 (D.C.Cir.1999) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

 Here, plaintiffs' hostile work environment claims stem from the abuse they allegedly endured from Smith. According to plaintiffs, Smith regularly spoke to them disrespectfully, threatened them, yelled at them, called them names such as "chick" and used such words as "bitch" in their presence. (Pls.' Ex. 15, Interrogs. 11–12.) He did not treat male employees this way. (Pls.' Stat. ¶¶ 24–24, 75.) Moreover, he only socialized with men, including frequent visits to strip clubs, which these male officers would then discuss back at work. Plaintiffs suggest that through his behavior and his attitude, Smith fostered a climate of disrespect for plaintiffs by second-guessing their decisions, undermining their authority, and refusing to punish other officers who tried to take advantage of them. (Pls.' Stat. ¶¶ 85–86, 89) Finally, as

the employer honestly believes in the reasons it offers.") (quotation marks and citation omitted).

further evidence that Smith's hostility was gender-based, plaintiffs cite the testimony of Jim Poppino, who reported that Smith once told him that, "Women don't belong in security. They should stay home and take care of their kids." (Pls.' Ex. 7 (Poppino Dep.) at 97–98.)

■ The Court finds that plaintiffs' claims survive summary judgment. Plaintiffs have put forward enough evidence for a reasonable jury to conclude that Smith's action were sufficiently pervasive and severe for liability to attach. Defendants seek to resist this conclusion with a divide-and-conquer strategy, picking out individual allegations and arguing that they do not satisfy the legal standards described above. (Defs.' Mot. at 47–51.) The Court, however, is obliged to consider the whole picture, not just particular pixels. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270–71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (in evaluating hostile work environment claim, "[w]orkplace conduct is not measured in isolation"). This perspective undermines defendants' position. For, while it is true that a hostile work environment claim does not arise merely because a supervisor uses a particular word or makes an offensive remark,[15] here plaintiffs have pointed to a pattern of offensive behavior and inappropriate, gender-tinted language. Specifically, Smith's persistent use of degrading words such as "chick," in conjunction with his other ongoing harassing behavior—the threats, the taunts, the yelling—all directed at plaintiffs, but not at their male co-workers, could allow a jury to find harassment. There is enough evidence to suggest that

these actions were not merely "isolated incidents," as defendants insist, *see Stewart,* 275 F.3d at 1134 ("Even a few isolated incidents of offensive conduct do not amount to actionable harassment."), but rather, part of a pervasive pattern of hostility and ridicule. (Pls.' Ex. 15, Interrog. 15.)[16] The Court therefore cannot conclude that plaintiffs' working environment was not so poisoned by Smith's hostility that the terms and conditions of their employment remained unaffected.

Especially important in this respect is the evidence of Smith's repeated efforts to undermine plaintiffs' authority as supervisors: refusing to discipline male employees who were disrespectful or whom plaintiffs had reprimanded (Pls.' Ex. 4 (Waters Dep.) at 207–08), describing Reed as incompetent in front of subordinates (Pls.' Ex. 14 (Reed Dep.) at 217), and, on at least one occasion, encouraging another officer to write a false report against Reed (*id.* at 210–11). These events are significant because a reasonable jury could conclude that such efforts, when targeted only at female supervisors, could have altered the terms and conditions of their employment. A supervisor who sees her authority undermined by obnoxious and demeaning behavior aimed at her because of her gender is undoubtedly affected in the material terms of her employment. Therefore, although a supervisor's nasty attitude is not enough to make a work environment hostile, *see Freedman,* 255 F.3d at 849, a nasty attitude selectively targeted at female employees, combined with active attempts to undermine the authority of those employees and to diminish the esteem with

---

**15.** *See Freedman v. MCI Telecommunications Corp.,* 255 F.3d 840, 848 (D.C.Cir.2001) ("[A] singular stray comment does not a hostile work environment make."); *Neuren,* 43 F.3d at 1513 (holding that the term "bitch" does not invariably indicate gender discrimination).

**16.** Indeed, plaintiffs complained to Smith about his offensive language, but he laughed off their complaints and continue to use the word "bitch" and to refer to plaintiffs as "chicks." (Pls.' Stat. ¶ 26.)

which other employees regard them, very well may.

Finally, there is evidence that Smith's conduct was sufficiently connected to plaintiffs' gender. Smith's remarks to Poppino certainly provides insight into his attitudes toward plaintiffs and into the likely explanation for his attitude and conduct toward them. It is hardly a stretch to believe that such a statement could allow a jury to conclude that Smith's hostile actions were motivated by the gender of his targets. This inference is of course reinforced by the evidence indicating that Smith did not treat his male subordinates in the unpleasant and demeaning manner to which he seems to have subjected plaintiffs. (Pls.' Ex 4 (Waters Dep.) at 182–83; Pls.' Ex 14 (Reed Dep.) at 175.) Plaintiffs have thus satisfied their burden of showing that Smith's conduct was motivated by a discriminatory animus toward women.

It has been recognized that, given how fact-intensive most hostile work environment cases are, such claims are often not appropriate for disposition on summary judgment. *See Armstrong v. Reno*, 172 F.Supp.2d 11, 24 (D.D.C.2001). This case is no exception. Because there are genuine disputes about material issues of fact concerning both Smith's misogyny and the severity and pervasiveness of his harassing conduct, and because a reasonable jury could well conclude that his conduct was motivated by gender animus, the Court cannot grant summary judgment on plaintiffs' hostile environment claims. Defendants' motion must therefore be denied as to Count II.

## IV. Count III: Retaliation

█ The DCHRA "makes it an unlawful discriminatory practice for an employer to retaliate against an employee due to her opposition to any practice made unlawful by the DCHRA." *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 585 (D.C.2001); *see* D.C.Code 2–1402.61. In order to establish a *prima facie* case of retaliation, plaintiff must demonstrate: (1) that she engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two. *See Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C.1994); *accord Brody*, 199 F.3d at 452 (same test for Title VII retaliation claims). The third prong can be satisfied by a showing the employer knew about the employee's participation in protected activity and thereafter took an adverse personnel action against her. *See Childers*, 44 F.Supp.2d at 18–19; *see also, e.g., Burke*, 286 F.3d at 522. Once the requisite *prima facie* showing has been made, the same burden shifting analysis used for discrimination claims applies. *See Singletary v. District of Columbia*, 225 F.Supp.2d 43, 55–56 (D.D.C.2002).

█ In this case, the complaint asserts that defendants "in response to Plaintiffs' complaint of gender discrimination, demoted Plaintiffs Waters and Dickerson." (First Am. Compl. ¶ 35.)[17] Now, however, in opposing defendants' motion for summary judgment, plaintiffs have sought to broaden this claim, asserting that when Smith suspended them after they complained about his harassing treatment, he engaged in unlawful retaliation under the DCHRA. (Pls.' Opp. at 52–53.) An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims. *See* Fed. R. Civ. P. 7(a) (listing complaints, answers, and replies to cross-claims as the only forms of pleadings allowed under the rules). Plaintiffs had the opportunity to make a retaliation claim

17. Plaintiff Reed has no retaliation claim.

based on their suspensions in their initial complaint and in their amended complaint; they chose not to do so. Accordingly, the Court will not consider that claim at this stage.[18]

The substance of the retaliation claim that plaintiffs did make is that SecTek removed Dickerson and Waters from their supervisory positions in retaliation for their complaints about Smith's alleged discriminatory behavior toward them.[19] *See O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1255 (10th Cir.2001) (holding that informal complaints to superiors about discrimination constitute protected activity). In order to state a *prima facie* case, plaintiffs must therefore establish that Rhodes—the actual decisionmaker—knew about their complaints at the time that he made his decision. *See Laboy v. O'Neill*, 180 F.Supp.2d 18, 26 (D.D.C.2001) (granting defendant's motion for summary judgment where plaintiffs could not make a showing "that any of those capable of making employment decisions had knowledge" of plaintiff's allegations of discrimination).

The clearest of plaintiffs' complaints was the February 16, 2001 letter from their attorneys to Cynthia Cherry advising her that Dickerson and Waters believed that they were being subjected to gender discrimination by Smith and threatening litigation. (Pls.' Ex 31.) However, according to Rhodes, he made his official announcement to NIMA that he was removing Dickerson and Waters (along with Smith) one day earlier, on February 15. (Defs.' Ex. 8 (Rhodes Dep.) at 153.) Similarly, Blood testified that prior to this meeting with NIMA, SecTek had already made the decision to demote Waters and Dickerson. (Defs.' Ex. 5 (Blood Dep.) at 147.) Defendants have also produced Rhodes' agenda for that meeting, which includes as item III, "Three Personnel Changes Are in Order," and describes the reasons for SecTek's decision to remove Smith, Waters and Dickerson from their positions. (Defs.' Ex. 20.) To counter this evidence, plaintiffs point to the testimony of Allison Hall, who was present at the February 15 meeting. Hall testified that, while she remembers seeing items I and II on Rhodes' agenda, she has no recollection of item III or anything else in the document referring to personnel changes. (Pls.' Ex 5 (Hall Dep.) at 141.) Plaintiffs suggest that this creates a dispute regarding the material fact of whether Rhodes' demotion decision came before or after SecTek received the February 16 letter.

The Court need not venture into this debate, because focusing on what happened at the February 15 meeting misses the crucial point, which is that the adverse action at issue here—plaintiffs' demotions—actually happened on February 6 and February 9, when Dickerson and Reed

---

18. Moreover, even if this claim had been asserted in a timely manner, it could not survive summary judgment. As the Court concluded above, Smith's suspension of Dickerson and Waters did not constitute adverse employment action. Therefore, that action could not have served as the basis for a retaliation claim.

19. Plaintiffs also argue that after they filed this lawsuit, Jim Poppino, who was then SecTek's Project Manager at the NIMA site, "engaged in a campaign of harassment" against them. (Pls.' Opp. at 55.) This claim fails because plaintiffs' have not and cannot demonstrate that any adverse action was taken against them after the suit was filed. All they have alleged is that Poppino became angry about the case, that he frequently questioned plaintiffs about it, and told them they should have dropped the matter. (Pls.Stat.¶¶ 134–35.) None of this constitutes a material change in the terms and conditions of plaintiffs employment, and therefore none of it can serve as the predicate for a DCHRA retaliation claim. *See Simms v. U.S. Gov't Printing Office*, 87 F.Supp.2d 7, 10 n. 3 (D.D.C.2000).

were (respectively) brought back to work as duty officers, with the diminished salary that goes along with that rank. As described above, plaintiffs were effectively demoted, whether or not a formal announcement was made to that effect—when they lost their supervisory positions and salaries. This occurred when Rhodes decided to reinstate Dickerson and Reed after their suspensions but not at their previous rank and pay. There can be no dispute that this decision was made and implemented before the February 16 letter. Therefore, if plaintiffs are to satisfy the third step of their *prima facie* case for retaliation, they must show that Rhodes had been made aware of their complaints by some different means.

This plaintiffs attempt to do by pointing out that they left several messages for Rhodes in an attempt to speak with him about Smith's behavior. (Pls.' Opp. at 53; Pls.' Stat. ¶ 29.) They also assert that on several occasions they asked Cherry, the Human Resources Director, to arrange a meeting with Rhodes. No such meeting ever took place. (Pls.' Ex. 15, Interrog. 23.) This evidence, however, is not sufficient to overcome Rhodes' unequivocal testimony that he did not know about plaintiffs' complaints. (Defs.' Ex. 8 (Rhodes Dep.) 222–23.) The efforts to which plaintiffs point, even taken as true, do not create a material dispute about whether Rhodes was aware of their charges against Smith. This evidence merely documents an attempt to inform Rhodes, not actual knowledge.[20]

Moreover, even assuming that plaintiffs can establish a *prima facie* case of unlaw-

ful retaliation, their claim fails for the same reason as did their discrimination claim: they cannot rebut the legitimate explanation that SecTek has offered for its action. As documented above, Rhodes explained that his decision was based on his perception that the management team was dysfunctional and that SecTek's obligations under the contract were being compromised. This is a legitimate and reasonable basis for demoting plaintiffs along with Smith, and there is nothing in the record to suggest that it was a pretext or that real purpose for which Dickerson and Waters were demoted was to retaliate against them for their complaints of discrimination. For these reasons, defendants' motion will be granted as to Count III.

## CONCLUSION

For the reasons given above, the Court will grant defendants' motion for summary judgment as to Counts I (disparate treatment discrimination) and III (retaliation), but deny that motion as to Count II (hostile work environment discrimination).

## *ORDER*

For the reasons provided in the attached Memorandum Opinion, it is hereby

**ORDERED** that defendant's motion for summary judgment [69–1] is **GRANTED** as to Counts I and III; and it is

**FURTHER . ORDERED** that defendant's motion for summary judgment is **DENIED** as to Count II; and it is

---

**20.** Plaintiffs' theory that Rhodes' conduct is actionable "because it was infected by Smith's discriminatory animus" (Pls.' Opp. at 53) is based on an unsupported and unsupportable premise. While Smith seems to have known about the complaints that plaintiffs had made against him, there is—as discussed above—simply no evidence that he influenced, or in any way contributed to, SecTek's decision to demote Dickerson and Waters. His knowledge therefore cannot support a retaliation claim based on a decision made independently by Rhodes.

FURTHER ORDERED that this matter is set down for a status conference on December 6, 2002, at 9:30 am.

SO ORDERED.